UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MONIQUE OUTZEN individually and on behalf of all others similarly situated, et al., | ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-01286-TWP-MJD |
| | ) | |
| KAPSCH TRAFFICCOM USA, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTION TO COMPEL AND FOR SANCTIONS**

This matter is before the Court on Plaintiffs' Motion to Compel and for Sanctions Against Defendant Kapsch [Dkt. 117].  The Court, being duly advised, **GRANTS** Plaintiffs' motion for the reasons and to the extent set forth below.  The Court also **GRANTS** Plaintiffs' motion to file a supplemental reply [Dkt. 145], and the Court has considered the supplemental reply [Dkt. 146] and Kapsch's response thereto [Dkt. 150] in ruling on the motion to compel.

**I. Background**

This consolidated action was created when *Barker v. Kapsch Trafficcom USA, Inc.*, 1:19-cv-0987-TWP-MJD ("the *Barker* Action") was consolidated into this case.  Both cases arise out of the Defendants' operation of the RiverLink system, which allows for electronic toll collection for bridges crossing the Ohio River between Southern Indiana and Northern Kentucky.  Plaintiffs allege that they and the members of the putative classes they seek to represent received invoices for tolls that did not give them the requisite amount of time to pay them before incurring late fees

and/or received second or subsequent toll notices that included penalties and/or fees for late payment when they had never been sent initial invoices for the tolls in question. Plaintiffs allege that Defendants violated their contractual obligations as toll service providers by sending these improper invoices and charging improper fees and penalties.

On July 1, 2020, shortly before the cases were consolidated, the Court issued an order in the *Barker* Action on Barker's motion to compel discovery from Defendant Kapsch Trafficcom USA, Inc., ("Kapsch") (hereinafter referred to as the "*Barker* Order"). The Court granted the motion in large part, ordering Kapsch to do the following by July 31, 2020:

- determine whether Kapsch had a contractual right to obtain documents that were in the possession of co-Defendant Gila, LLC, or others and, if so, to supplement all of its discovery responses accordingly

- produce a privilege log that identified all responsive documents that Kapsch had withheld as privileged except for two narrow categories of documents[1]

- provide a complete and unequivocal response to Interrogatory No. 2

- provide complete and unequivocal responses to Interrogatories Nos. 4 and 6 and Document Request No. 2, all of which are interrelated, with the caveat that the responses could be limited to those individuals who were assessed an administrative fee or penalty

---

[1] The *Barker* Order provided that Kapsch did not have to log documents that: (1) related solely to this case or the *Barker* Action that were exchanged between Kapsch and its outside litigation counsel and copied to no one else; or (2) related solely to this lawsuit or the *Barker* Action that were exchanged between Kapsch's outside litigation counsel and Gila's outside litigation counsel and copied to no one else, with the exception of all documents relating to the Phase 2 remediation plan testified to by Vivian Raines that were withheld as privileged, which were to be logged regardless of whether they fell under one of the two excluded categories.

- provide a complete and unequivocal response to Interrogatory No. 11 and related
  Document Request No. 3

*See* Dkt. No. 248 in the *Barker* Action.  The Court also overruled Kapsch's privilege objections to Interrogatory No. 9, but denied the motion to compel as moot as to Interrogatories Nos. 9 and 10 in light of Kapsch's agreement to supplement its answers to those interrogatories.  *Id.*  Finally, the Court overruled Kapsch's relevancy objections that were based on Kapsch's attempt to distinguish between information related to "missing invoices" and that related to "late invoices," and ordered Kapsch to respond to all of Plaintiffs' discovery requests without drawing that distinction.  *Id.*

In its Order consolidating the *Barker* Action and this case, the Court ordered the parties to "supplement their Fed. R. Civ. P. 26 initial disclosures and [] serve supplemental responses to all previously served discovery in either case in light of the expanded scope of the claims in the consolidated case" by September 4, 2020, thus effectively extending Kapsch's deadline to comply with the *Barker* Order from July 31, 2020, to September 4, 2020.  There is no dispute that Kapsch failed to comply with this deadline.  This was memorialized by the parties' September 14, 2020, Supplemental Joint Report on the Status of Discovery.  [Dkt. 54 at 2] ("Kapsch has not yet produced its September 4, 2020 supplemental document production as ordered by the Court and it is unclear when those documents will be produced.").  Kapsch explained:

> Kapsch tendered its consolidated written discovery responses, and consolidated Initial Disclosures, to Plaintiffs on September 4, 2020, at which time Kapsch informed Plaintiffs that due to the size of the document production (approximately 80 GB), a drive was being sent directly from Kapsch's ESI vendor. Kapsch thereafter informed Plaintiffs' counsel that it became aware of a delay in the vendor's tender of the production.  Kapsch's production has in fact been shipped

3

by the vendor, and Kapsch was most recently informed by its vendor that the production was indicated for mail delivery on Monday September 14, 2020.

*Id.* In their next Supplemental Joint Report on the Status of Discovery, filed October 12, 2020, the parties explained the status of Kapsch's discovery responses as follows:

> Kapsch made a large document production of approximately 80 GB, which arrived to Plaintiffs on September 14, 2020 (with a follow up production of documents reviewed for privilege made on September 23, 2020). . . . The parties agreed that Kapsch would provide an additional privilege log, which Kapsch tendered to Plaintiffs on October 2, 2020. The parties also discussed the search terms utilized by Kapsch in its previous searches, following which Kapsch agreed to run an additional search across its custodians of terms preferred by Plaintiffs. That search has been initiated and Kapsch will make a production to Plaintiffs of any documents yielded by that search that are responsive, to the extent they have not yet been produced. The parties also discussed the scope of the Gila database produced to Plaintiffs. It is Kapsch's understanding that Gila is making an additional production to Plaintiffs of the entirety of its Titanium database, without exclusion of data concerning other projects, at Plaintiffs' request. Finally, Kapsch and Plaintiffs discussed the detail of Kapsch's 33(d) designations, following which Kapsch directed Plaintiffs to GILA-BARKER-025537-GILABARKER-025538 consolidated tables of information within the database responsive to Interrogatory No. 4, but also agreed to (and has) request from Gila specific queries to search for that information within the database itself.

[Dkt. 60 at 3-4.] The report further stated that counsel for Kapsch and Plaintiffs had been in "regular communication" regarding the discovery issues. *Id.* at 3; see also *id.* at 2 ("Plaintiffs identified several deficiencies and discovery disputes in an August 19, 2020 email. The Parties have held telephone conferences on September 18, 23, and 25 and exchanged several emails to work through this discovery dispute, and continue to do so at this time.").

On October 30, 2020, new counsel appeared for Kapsch; its previous counsel withdrew their appearances a few days later.

In their next Supplemental Joint Report on the Status of Discovery, filed November 9, 2020, Plaintiffs reported that "[a]s discussed at the last discovery conference with the Court, Kapsch confirmed in late September and early October that it had not yet produced documents

4

responsive to Plaintiffs' requests.  Plaintiffs have not yet received those documents." [Dkt. 70 at

2.]  Kapsch reported:

> Kapsch's new counsel has been diligently working to access all of Kapsch's data
> so that it can make a final document production.  This production is expected to
> happen shortly and consists of documents that are responsive after applying
> certain search terms and limiters that were not previously applied to the inboxes
> of several custodians from whom documents have already been produced.

*Id.* at 3.

In their next Supplemental Joint Report on the Status of Discovery, filed December 14,

2020, Plaintiffs reported several issues.  First, Plaintiffs noted that

> Kapsch [had] informed Plaintiffs in early October that it had run additional search
> terms identified by Plaintiffs against the account of Vivian Raines, determined
> that responsive documents had neither been captured by its previous search terms
> nor produced, and would thus search all custodians using the additional search
> terms and then produce the documents. Kapsch indicated in its October 11
> discovery report that this search had already been initiated.  Kapsch then retained
> new counsel in late October, 2020, who indicated during the November 15
> discovery conference with the Court that Kapsch had identified 2TB of ESI to
> search/produce.    Since that conference, Plaintiffs have had multiple
> communications with Kapsch regarding the status of this production and were
> informed on December 7 and 14 that search terms were not actually run as
> previously represented by Kapsch in the October 11 report to the Court, and have
> still not been run, against the documents but that Kapsch is in the process of
> sending the 2TB of ESI via mail to Kapsch's counsel on a hard drive.  Kapsch's
> counsel was uncertain when it will arrive, and has indicated that after it arrives, it
> will need to be processed before any search terms can be run or documents
> reviewed/produced.  Kapsch has been unable to provide a specific timeline for
> when these documents will be produced.

[Dkt. 74 at 2-3.]  Kapsch responded:

> In September, Kapsch produced a large volume of documents based on search
> terms Kapsch and its previous counsel deemed to be appropriate.  Plaintiffs raised
> some concerns with the September production so as a courtesy, Kapsch and its
> counsel agreed to run a search on Vivian Raines' inbox using the non-party search
> terms created by Plaintiffs.   This was the start of the pending supplemental
> production Kapsch is currently processing, which Kapsch believes outside of and
> separate from the issues set forth in the Court's order on the motion to compel.
> Counsel for Kapsch is working diligently to obtain and process the data for

purposes of running an additional search across custodians of terms within Plaintiffs' non-party requests for production and to produce any documents yielded by that search that prove to be responsive, if they have not already been produced. We had hoped to port over 2 terabytes of data beginning two weeks ago, however, there was unavoidable delay in obtaining the needed information from various sources. We are told the information is in route to us on a [sic] hard drives (the data is too large to send via any other method). We will process and then search the data as soon as possible and have committed to Plaintiffs' counsel to keep them apprised of our progress.

*Id.* at 3-4. Next, Plaintiffs asserted that "Kapsch has made Rule 33(d) designations in responding to Interrogatories that do not specifically identify documents for Plaintiffs or even provide references that include later document productions made by Kapsch." *Id.* at 4. Kapsch responded that it had "in fact specifically identified documents pursuant to Rule 33(d), as clearly shown in the responses as they provide specific bates number ranges in response to each interrogatory." *Id.* Next, Plaintiffs raised the fact that Kapsch's document production had not included the documents of in-house counsel, Janet Eichers. Kapsch responded that it had "agreed to search Ms. Eichers' emails and documents for those communications, using the nonparties identified by Plaintiffs. We anticipate this will take two to four weeks to perform, given the upcoming holidays." *Id.* at 5. Finally, Plaintiffs raised issues regarding Kapsch's privilege log. Kapsch's position was that the privilege log was fully compliant with the Court's Order. *Id.* at 5-6.

The next Supplemental Joint Report on the Status of Discovery, filed January 11, 2021, indicated that none of the issues raised in the prior report had been resolved. Kapsch explained:

(i) Additional Documents: Within the last few days, all of the necessary data to run the additional searches discussed by Plaintiffs and Kapsch have now been fully loaded into Taft's system. The information was deduped against the information already produced and 2.2 million documents remain. Kapsch will now run timeframe and search parameters as previously discussed and then we will know the actual universe of relevant documents, if any. Kapsch will then have an idea of how long it will take to review and produce.

6

(ii) Rule 33(d) Designations and Privilege Log:  Kapsch continues to maintain its interrogatory responses and privilege log entries are sufficient and proper.  However, Kapsch is working to supplement both.  Supplementation could not be complete until all of the documents were uploaded into Taft's system.  Now that the upload is complete, we can review and compare the interrogatory responses with the documents identified as well as review documents necessary to update the privilege log as appropriate.  We hope to have that finalized within 10-14 days.

(iii) Janet Eicher's emails:  Kapsch has agreed to search and produce relevant and responsive emails from Ms. Eicher's account.  During the discovery conference, counsel for Plaintiffs stated that he does not want Kapsch to dedupe Ms. Eicher's emails against the prior production.  Kapsch is in the process of receiving that data and will then go forward with the search.  As of the date of this report, we expect that all of the data will be uploaded and ready for review by Friday, January 15, 2021 at the latest.

[Dkt. 89 at 2-3.]

On January 16, 2021, Plaintiffs served their second set of document requests.

In their next Supplemental Joint Report on the Status of Discovery, filed February 8, 2021, Kapsch reported that it was still "working to supplement its privilege log in response to Plaintiffs' concerns," that its efforts to do so had been "delayed where Kapsch was unable to locate the withheld privilege documents that had been collected and maintained by others," but that it had recently obtained the necessary information from Kapsch's former counsel and it "anticipate[d] completing its privilege log within the next two weeks."  [Dkt. 96 at 3.]  Kapsch further reported that it had just that day served supplemental interrogatory responses that it believed "should alleviate Plaintiffs' concerns related to the Kapsch Rule 33(d) designations."  *Id.*  Plaintiffs' preliminary review of those supplemental responses was not promising.  *Id.* ("[R]eview of those supplemented answers evidences that the same deficiencies that have been discussed by counsel and the Court for months, including at length with the Court during a December, 2020 discovery conference, still remain unresolved.").  Finally, Kapsch reported that

with regard to the additional production of the new data set and the Janet Eichers' emails, Kapsch has uploaded and searched the data sets using the nonparty search terms used earlier in the case.  With regard to the Eichers' emails, the search yielded 60,708 hits including families.  At the request of Plaintiffs' counsel, these emails were not de-duped against the prior production set.  It is believed that the vast majority of these will be either non-responsive, privileged, or both.  Because Ms. Eichers is an attorney, this requires a document-by-document review before production.  With regard to the new data set, the search yielded 266,612 hits.  Kapsch shared this information and the hit reports with Plaintiffs' counsel.  On February 3, Plaintiffs' counsel asserted that these search terms should be expanded to include the "Gila search terms."  Obviously, any expansion of the search terms will also increase the amount of hits.  Kapsch anticipates that the parties will meet and confer regarding the scope of these discovery requests in conjunction with the new 33 requests for production of documents propounded by Plaintiffs and to determine whether Plaintiffs prefer to receive such a large swath of documents (which will likely include large amounts of irrelevant material) or would like to work to narrow down the amount of documents to be produced.

*Id.* at 3-4.  During a status conference held on February 10, 2021, the Court authorized Plaintiffs to file a motion to compel in light of Plaintiffs' position that Kapsch's responses to Plaintiffs' initial discovery requests remained incomplete.

In their next Supplemental Joint Report on the Status of Discovery, filed March 8, 2021, Plaintiffs reported that they were in the process of drafting the instant motion to compel.  With regard to their second set of discovery requests, Plaintiffs reported that Kapsch had served written responses by the February 23, 2021, deadline, but had not produced any documents. Plaintiffs stated:

In addition to Kapsch's failure to make a production of documents by the deadline for responding to the 2nd Set of RFPs, Plaintiffs take issue with the merits of the objections raised by Kapsch as well as the responses where Kapsch indicates it will use limited search terms that do not appear reasonably designed to wholly locate responsive documents.  Kapsch confirmed after providing these Responses that it had not actually run the proposed search terms or reviewed responsive documents prior to tendering the Responses.

8

[Dkt. 112 at 3.]  Kapsch confirmed that its responses "proposed targeted searches for most of the second set of requests proposed by Plaintiffs" and that Plaintiffs "asserted the proposed searches were insufficient and in need of expansion, but did not specify how the proposed searches were insufficient."  *Id.* at 4.  Therefore, Kapsch had "requested clarification on the proposed search terms to avoid the issues that arose last summer before Kapsch's current counsel became involved."  *Id.*  With regard to Plaintiffs' initial set of discovery requests, Kapsch again reported that it continued to address Plaintiffs' issues with its privilege log and "to work on its redaction, quality control, and privilege log of Eichers' emails, but has begun a rolling production of responsive documents."  *Id.*  Kapsch further stated that

> Concerning the bigger data production, Kapsch awaits input for Plaintiffs' counsel as to the search terms adequate to provide responsive documents to Plaintiffs' requests.  Initially, Kapsch provided Plaintiffs with search term reports showing the universe of documents in the data set.  Kapsch offered to produce to Plaintiffs all hits from the agreed-upon search terms.  Initially, Plaintiff stated it would like Kapsch to produce that universe of documents, however, would now like to meet and confer to discuss the possibility of further narrowing the hits for the larger production.  Kapsch anticipates that progress will be made at the scheduled meet and confer for March 10, 2021.
>
> Based on the current searches proposed in its Responses, Kapsch can complete its production within ten to fifteen days of an agreement on search terms.  Broader searches may lead to a longer timeline.  The privilege log covering these additional data will follow.

*Id.* at 4-5.

Plaintiffs then filed the instant motion on March 16, 2021.

## II. Discussion

The discovery disputes between Plaintiffs and Kapsch remain a moving target.  In addressing the issues raised by Plaintiffs, the Court has focused on both the forward-looking goal of ensuring that Plaintiffs obtain the discovery to which they are entitled and the backward-

looking question of what, if any, sanctions are appropriate given Kapsch's failure to provide complete responses to Plaintiffs' discovery requests in a timely manner.

### A.  Responsiveness Review

Kapsch has produced hundreds of thousands of electronic documents.  Plaintiffs object to the fact that Kapsch has not reviewed the documents for relevancy and responsiveness, and therefore has admittedly produced many irrelevant documents.  Kapsch's position is that it searched the files of the relevant document custodians using search terms agreed upon by the parties, that the results of those searches are presumptively responsive documents, and that it is not obligated to further review those documents to remove any irrelevant documents that may have been captured by the searches.

A party's obligations with regard to responding to a document request is governed by Federal Rule of Civil Procedure 34(b)(2)(E)(i), which provides that the party "must produce documents as they are kept in the usual course of business or must organize and label them to correspond to the categories in the request."  The practical application of this requirement was aptly addressed recently as follows:

> Essentially, the Federal Rules of Civil Procedure require that the producing party give some structure to its production:  a party may not dump voluminous, poorly organized documents on its adversary and force him or her "to rummage through piles of paper in search of what is relevant.  To comply with the rule, a party must rationally organize[ ] its productions, so that the requesting party may readily identify documents, including ESI, that are responsive to [the] production requests." *Teledyne Instruments, Inc. v. Cairns*, 2013 WL 5781274, at * 8 (M.D. Fla. Oct. 25, 2013) (alterations in original).

> The underlying assumption of Fed. R. Civ. P. 34(b)(2)(E)(i) is that businesses have an incentive to maintain their documents in a manner that allows the "systemized retrieval of relevant documents" when needed, so a production of documents as kept in the ordinary course of business will allow the opposing party to utilize that system and locate responsive documents. *Andritz Sprout–Bauer, Inc. v. Beazer East, Inc.*, 174 F.R.D. 609, 630 (M.D. Pa. 1997).  When

producing ESI "as kept in the ordinary course of business," the most straight-forward method is to produce the device(s) (or forensic copies of the device(s) on which the files are stored. In the alternative, the responding party may choose to produce electronic files or documents rather than the devices. If it does so, however, it must ensure that the ESI is produced in a format that preserves the functional utility of the electronic information and provides sufficient information about the context in which the information was kept and organized by the producing party so that the requesting party can substantially replicate the system and find relevant documents. *McKinney/Pearl Rest. Partners, L.P. v. Metro. Life Ins. Co.*, 322 F.R.D. 235, 249-50 (N.D. Tex. 2016).

*Money Mailer, LLC v. Brewer*, 2020 WL 1515647, at *1 (W.D. Wash. Mar. 30, 2020).

Electronically stored information must be produced in its native format; "'[a] file that is converted to another format solely for production, or for which the application metadata has been scrubbed or altered, is not produced as kept in the ordinary course of business.'" *Id.* (quoting *McKinney/Pearl Rest. Partners*, 322 F.R.D. at 250).[2]

In addition, the producing party must provide information about where the documents are kept and how they are organized. For documents stored on a computer or external storage device, this means providing system metadata indicating at least the file name and path for produced files. The files and system metadata[ ] must be organized in a manner that "permits systemized retrieval" of files based on the metadata. In other words, the requesting party must be able to search for and readily access files with particular characteristics (*e.g.* all .doc files in X folder).

For emails, the relevant context is somewhat different. A user typically views emails not in a file browser, but in an email client. While the relevant organizational information for files viewed in a file browser is file name and path, the relevant information in an email client is the date the email was transmitted, perhaps along with the parties to the email (sender and recipients), and the subject line.

---

[2] The case management plan in this case provides that "[u]nless otherwise agreed to by the parties or ordered by the Court, all electronically stored information will be produced in its native format." [Dkt. 50 at 2.] Plaintiffs do not argue that Kapsch has failed to comply with this provision.

*Id.* (citation omitted).  In this case, Kapsch has organized the documents it has produced by custodian and has produced them with metadata fields that maintain the original file path and folder information.

In the halcyon days before e-discovery, when documents were kept in filing cabinets rather than on servers, a corporate party could satisfy its obligations under Federal Rule of Civil Procedure 34(b)(2)(E)(i) by giving the requesting party access to the files of the relevant employees or departments within the corporation.  For example, the response could say "the responsive documents may be found by examining the files maintained by employees Smith and Jones and the files maintained by the Finance Department."  The responding party would then either provide copies of or access to those files as they were kept in the ordinary course of business.  It would be up to the requesting party to search through them and separate the relevant from the irrelevant.  The rule implicitly recognizes that such a review would be equally burdensome on either party and allows the producing party to decide which is more palatable: permitting the requesting party to rummage through its files or incurring the expense of culling the responsive documents from those files and organizing them according to each request.

Kapsch has done the equivalent of giving Plaintiffs access to its files, with the additional step of limiting its production to those documents that contain the search terms agreed upon by the parties.  This process is almost certainly not perfect, in that there are likely some relevant documents that were not captured by the searches[3] and clearly some irrelevant documents that

_____

[3] Plaintiffs do not argue that Kapsch should search for documents beyond those identified by the agreed-upon searches.  *See* [Dkt. 129 at 11] ("Plaintiffs agree that Kapsch need not search every scrap of paper in its possession. That is why Plaintiffs proposed and agreed upon search terms to narrow the universe of documents for Kapsch to search.").

were, but the alternative would be for Plaintiffs—not Kapsch—to cull through *all* of the

numerous custodians' files in search of the relevant files, as they would have had to have done if

the files had only been maintained on paper.  Thus, Kapsch's production of the non-privileged

documents that resulted from using the agreed-upon search terms to search the relevant

document custodians' files satisfied its obligations under Rule 34.  No additional responsiveness

or relevance review was required.[4]

None of the cases cited by Plaintiffs require a contrary holding.  *Rothman v. Emory*

*University*, 123 F.3d 446 (1997), did not involve documents produced as they were kept in the

usual course of business.  The issue in *RTC Indus., Inc. v. Fasteners for Retail, Inc.*, 2019 WL

5003681, at *18 (N.D. Ill. Oct. 8, 2019), was whether RTC improperly included irrelevant

documents on its privilege log.  The court determined that RTC "should have first evaluated the

relevance and responsiveness of the documents 'hit' by the search terms before putting them on

its log, as it was permitted to do under the parties' agreement," and that its failure to do so

resulted in the forfeiture of "any responsiveness or relevance objection to producing documents

and communications it has identified on its privilege log."  In other words, RTC was **required** to

turn over non-privileged documents listed on its privilege log **even if those documents were not**

**relevant or responsive**, which is the opposite of the relief Plaintiffs seek here.  *Giles v. City of*

*Lincoln*, 2018 WL 4682024, at *3 (D. Neb. Sept. 28, 2018), does indeed "contemplate" that the

_____

[4] Plaintiffs state in their reply brief that the parties agreed that Kapsch would conduct a
responsiveness review of the documents found by running the searches agreed upon by the
parties.  It appears to the Court that while Plaintiffs believed that to be the case, based on
Kapsch's use of the word "review" in various emails between the parties, Kapsch likely was
referring to a review for privilege, not responsiveness.  In any event, there is nothing to prevent
Plaintiffs' counsel from performing the same searches now that they possess the information.

producing party in that case would "filter out irrelevant documents from their production," as Plaintiffs state, but the court did not address whether that process was required by Rule 34 when the producing party chooses to produce documents as they are kept in the usual course of business. The same is true of *Consumer Fin. Prot. Bureau v. Navient Corp.*, 2018 WL 2088760, at *7 (M.D. Pa. May 4, 2018). And in *F.D.I.C. v. Briscoe*, No. 1:11-CV-02303-SCJ, ECF 98, (N.D. Ga Jun. 4, 2013), the court expressly noted that the producing party "does not contend that the documents will be produced as they were kept in the usual course of busines," and therefore a responsiveness review was required in order to comply with Rule 34.

Because Kapsch is producing the documents retrieved by the search terms agreed upon by the parties as those documents are kept in the usual course of business, Kapsch does not have to further review those documents for relevance or responsiveness in order to comply with Federal Rule of Civil Procedure 34(b)(2)(E)(i).

### B. Objections

Plaintiffs argue that Kapsch has improperly lodged boilerplate or otherwise unsupported objections to their second set of document requests. In response, Kapsch states unequivocally that it has not withheld any documents based on the objections, but argues that "Kapsch has a right to object to preserve possible future arguments—for example, as to admissibility—even as it produces responsive documents." [Dkt. 124 at 23.] This argument is, quite frankly, bizarre. Whether a document produced during discovery is admissible at trial depends entirely on the Federal Rules of Evidence. The fact that a party produced a document in discovery without objecting will not be relevant to that inquiry in any way. The fact that the party made a relevancy objection in conjunction with producing the document will be equally irrelevant to the admissibility inquiry. The purpose of objecting to a discovery request is to justify not

14

responding to the request in whole or in part. If a party is going to respond in full, there is no reason to object. For example, Kapsch objected that Plaintiffs' requests were not proportional to the needs of the case. To what end? If Kapsch is, as it claims, fully responding to the requests, it is wholly irrelevant that Kapsch believes the requests are not proportional, or duplicative, or cumulative, or overly broad, or unduly burdensome. Making such objections serves only to make Kapsch's assertion that it has fully responded (or is in the process of doing so) appear equivocal. To remove any ambiguity, Kapsch's objections to Plaintiffs' document requests, with the exception of those based on privilege, are **OVERRULED**, because they are moot given Kapsch's representation that it is not withholding any documents based on those objections.

### C. Privilege Log Issues

As noted above, in the *Barker* Order, the Court ordered Kapsch to produce a privilege log by July 31, 2020, that identified all responsive documents that Kapsch had withheld as privileged except for documents that fell into certain categories. There is no dispute that Kapsch failed to do so. Kapsch did produce a privilege log on July 31, 2020, but it included only two documents. [Dkt. 118-10.] It produced a supplemental privilege log on October 2, 2020, [Dkt. 118-11], and another on March 29, 2021, [Dkt. 129-11], after the instant motion was filed. It is not clear whether Kapsch now believes it has produced a complete privilege log, or whether its privilege review remains ongoing.

Other than Kapsch's obvious untimeliness, Plaintiffs raise two main issues with the current iteration of Kapsch's privilege log. First, Plaintiffs object to Kapsch's failure to identify attachments to various emails contained on the log. Kapsch describes the attachments as follows:

109 of the "attachments" were nonresponsive, consisting of email signature files, public filings in this case, and communications with opposing counsel, 86 of the "attachments" consisted of documents already produced to Plaintiffs, and 33 of the "attachments" were privileged documents.  The 33 privileged documents are now more specifically described on the privilege log, directly underneath the email to which they were attached.

[Dkt. 124 at 21.]  Kapsch argues that it is not required to include the remaining attachments on the privilege log.  With regard to the 86 attachments that already have been produced to Plaintiffs, Kapsch argues that, despite the fact that the attachments themselves are not privileged, "the fact of the attachment may be privileged" because it would reveal that the information contained therein was communicated for the purpose of giving or receiving legal advice.  In response, Plaintiffs argue that the identification of the attachments is necessary to allow "an assessment of Kapsch's assertions that it had produced documents when they were gathered and without delay," [Dkt. 118 at 27], and that "Kapsch cannot be allowed to assert that it promptly searched for and produced documents to avoid discovery sanctions, and then argue that facts evidencing when it searched for, reviewed and produced documents are blocked by attorney-client privilege," [Dkt. 129 at 13-14].

Both parties' positions have some merit.  Kapsch is correct that revealing that a non-privileged document was exchanged between attorney and client might, under some circumstances, reveal the substance of a privileged communication.  However, that is not always the case.  Plaintiffs also are correct that when and how a party gathered responsive documents can be a proper subject of discovery under some circumstances.  But Plaintiffs do not suggest that they have tendered discovery requests about the discovery process, and, in any event, there is no question at this point that Kapsch has wholly failed to comply with its obligation to respond to discovery in a timely manner.  Including otherwise-produced attachments on a privilege log

because they might, by implication, provide additional evidence of Kapsch's dilatoriness would simply be cumulative and serve no practical purpose.

The second issue raised by Plaintiffs with regard to the privilege log is Kapsch's failure to provide sufficiently detailed descriptions of the contents of the documents to permit Plaintiffs to assess the claims of privilege. Pursuant to Federal Rule of Civil Procedure 26(b)(5)(A)(ii), a privilege log must "describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." As Plaintiffs point out, the parties and the Court discussed the adequacy of the descriptions on Kapsch's first supplemental privilege log during a December 18, 2020, status conference, and the Court informed Kapsch at that time that many of its descriptions were lacking the requisite specificity. Its second supplemental privilege log does not remedy this problem. Entries that simply reproduce the subject line of an email generally are not sufficient to show that the email seeks or provides legal advice. For example, a document described as "Email re: Beazley: Kapsch TrafficCom Holding II USA Corp / Melissa Barker Class Action" certainly could be privileged, but it is not necessarily so; not every email about a lawsuit involves a privileged communication.

That said, the Court does not find Kapsch's privilege log to be so deficient as to warrant the sanction of privilege waiver requested by Plaintiffs, especially given that it appears likely that the documents in question are, in fact, privileged. Instead, the Court will require the following: **Within fourteen days of the date of this Order**, one of Kapsch's attorneys of record shall personally review each document listed on Kapsch's most recent privilege log and file an affidavit stating unequivocally that this review confirmed that each document communicates the

giving or receiving of legal advice.  If that is not true as to any listed document, that document

shall be produced to Plaintiffs immediately.

### D.  Specific Discovery Requests

In addition to the arguments above, Plaintiffs raise several specific arguments regarding

Kapsch's responses to several of its discovery requests.

#### 1.  *Interrogatory Nos. 9 and 10*

Interrogatories Nos. 9 and 10 seek information regarding Kapsch's affirmative defenses

and non-party defenses.  At the time of its original answers to these interrogatories, Kapsch had

not yet filed an answer, as its motion to dismiss was pending, and its responses to these

interrogatories reflected that fact.  In the *Barker* Order, the Court noted that Kapsch had recently

filed its answer and that Kapsch's counsel had committed during the hearing on the motion to

serving supplemental responses to the interrogatories the following day.  Accordingly, the Court

denied Plaintiffs' motion to compel with regard to Interrogatories Nos. 9 and 10 as moot.

Kapsch did, in fact, serve supplemental responses, but Plaintiffs argue they are still

inadequate.  In its Answer in the *Barker* Action, Kapsch asserted as an affirmative defense that

"Plaintiff's damages, if any, were caused by persons other than Kapsch Trafficcom USA, Inc.,

including Plaintiff herself, the Commonwealth of Kentucky and its agencies, the State of Indiana

and its agencies, and RevSpring."  The only information provided in Kapsch's responses to

Interrogatories 9 and 10 with regard to Kapsch's affirmative defense as it relates to RevSpring is

that "to the extent Plaintiff Barker was harmed in relation to invoicing and retention of monies as

alleged in her Amended Complaint, Kapsch has delegated such invoicing duties to Gila, LLC,

who in turn contracted with RevSpring as its mail house for invoicing purposes." [Dkt. 118-3 at

23.]  Plaintiffs are correct that this is insufficient.  **Within fourteen days of the date of this**

**Order**, Kapsch shall supplement its response to Interrogatory No. 10 to provide a detailed

factual and legal description of the basis for its assertion that RevSpring is responsible, in whole

or in part, for the injuries alleged in the Complaint, and shall identify any documents that relate

to that assertion.[5]

       2. *Interrogatory No. 4 and Request for Production No. 2*

       Interrogatory No. 4 seeks detailed information and identification of documents relating to

individuals who have used and been billed for using the Riverlink Toll Bridges;[6] Request for

Production No. 2 seeks production of those documents that Kapsch was asked to identify in

---

[5] Kapsch notes that Plaintiffs already have deposed some individuals with information related to
RevSpring and have the ability to depose others.  That is irrelevant to Kapsch's obligation to
respond to Plaintiffs' interrogatories.  Plaintiffs are entitled to a response from Kapsch explaining
the basis of its affirmative defense as it relates to RevSpring, regardless of how much other
information Plaintiffs may have about RevSpring's role in the relevant events.

[6] Interrogatory No. 4 reads:

    Identify all individuals who were invoiced, provided notice, requested, or
    required, to submit payment, for amounts allegedly owed arising out of use of any
    Riverlink Toll Bridge(s) and for each such individual, state the following:

       a.  The date(s) and location(s) on which such toll(s) were incurred;
       b.  The amount charged to that individual for such toll(s);
       c.  The date on and address to which the first Notice(s) of Toll was sent;
       d.  The date on and address to which any subsequent Notice(s) of Toll was
          sent;
       e.  The manner of mailing or other delivery for any and all Notice(s) of Toll
          sent;
       f.  Identify any proof or evidence of mailing for any and all Notice(s) of Toll
          sent:
       g.  Identify any proof or evidence of delivery for any and all Notice(s) of Toll
          sent:
       h.  The amount of any administrative fee or penalty assessed, invoiced, or
          charged to that individual in relation to such Toll(s);
       i.  Any documents or information you have that an individual did not receive
          any Notice(s) of Toll sent;
       j.  The amount paid and date of payment by the individual for such Toll(s);
       k.  The identity of the recipient of any such payment;

Interrogatory No. 4.  In response to these discovery requests, Kapsch referred Plaintiffs to the Titanium Database maintained by Gila that contains the responsive information.  Plaintiffs refer to this response as a "vague gesture toward a database backup file containing millions and millions of tables and rows of information in raw SQL format."  [Dkt. 118 at 22.]  Kapsch, however, states that because it "subcontracted this part of the project to Gila," the Titanium Database "has the entire universe of information that is responsive to Interrogatory 4 and RFP 2." [Dkt. 124 at 18.]  Further, Kapsch argues:

> because this ESI was produced as it was kept in the usual course of business, Kapsch is not required to categorize it according to Plaintiffs' requests.  F.R.C.P. 34(b)(2)(E)(i).  Moreover, Plaintiffs are fully able to run their own queries in the database to obtain the information that responds to the many sub-parts of Interrogatory 4—Kapsch is not required to do their work for them.

*Id.* at 18-19.  In their reply, Plaintiffs retort:

> Kapsch argues that it can shirk its Rule 33 obligations because "the [Riverlink] database itself is searchable by query, which Plaintiffs' counsel is fully able to do."  Def. Br. at 17.  It is not clear whether Kapsch has ever even opened or attempted to "use" Defendants' 1+ TB of raw SQL files (without the software Defendants use that allows a non-technical User Interface to conduct searches and create reports).  If Kapsch did, it would not make this argument.
>
> Moreover, Kapsch ignores that it promised in September, 2020, (and multiple times thereafter) that it would work with Gila to obtain and provide queries that could be identified in Answers to Interrogatories and used to search the database. [D.E. # 60] at 4. Without those queries, Plaintiffs are searching in the dark for specific search strings allowing them to employ the information Defendants have at their fingertips.  Plaintiffs have the right to require Kapsch to respond to

---

l.  The use of funds from any such payment; and
m.  Identify any documents evidencing or relating to the information sought in this Interrogatory.

[Dkt. 118-5 at 3.]  In the *Barker* Order, the Court found that subparts f, g, l, and m were overly broad and held that to the extent that they "require Kapsch to search for and produce information beyond that which would be contained in a database or billing system . . . Kapsch's responses to Interrogatories Nos. 4 and 6 and Document Request No. 2 may be limited to those individuals who were assessed an administrative fee or penalty."  *Barker* Action, Dkt. 248 at 10-11.

questions fully and accurately under oath. This is the basic purpose of Rule 33. Kapsch's continued argument that it can ignore Rule 33's requirements despite dozens of meet and confers and this Court's prior Order addressing this same issue does not withstand scrutiny.

[Dkt. 129 at 18-19.]

Federal Rule of Civil Procedure 33(d) provides:

If the answer to an interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing a party's business records (including electronically stored information), **and if the burden of deriving or ascertaining the answer will be substantially the same for either party**, the responding party may answer by:

> (1) specifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could; and

> (2) giving the interrogating party a reasonable opportunity to examine and audit the records and to make copies, compilations, abstracts, or summaries.

Fed. R. Civ. P. 33(d) (emphasis added).  Interrogatory No. 4 is a paradigmatic example of an interrogatory that is properly answered by invoking Rule 33(d).  It requests detailed information about a huge number of individuals, and all of the requested information is maintained in Gila's business records—specifically, the Titanium Database.  However, in order to comply with Rule 33(d), Plaintiffs must be able to utilize the database to ascertain the relevant information as easily as Kapsch can.  If Plaintiffs have not been given the ability to access the Titanium Database **using the same interface that Kapsch and Gila use to access it in the ordinary course of business**, then Kapsch has not complied with Rule 33(d).  Kapsch must either provide that ability to Plaintiffs or provide a full and complete response to Interrogatory No. 4 without invoking Rule 33(d) **within 14 days of the date of this Order**.

### 3. Interrogatory No. 11 and Request for Production No. 3

Interrogatory No. 11 reads:

Do you admit that some individuals were assessed, charged, invoiced, or provided notice to pay administrative fees or penalties in a second (or other later) Notice of Toll where said individual(s) did not receive a first Notice of Toll?  If so, identify all such individuals and instances and provide a detailed explanation identifying all facts and documents evidencing, relating to, or otherwise describing the reason for each such occurrence.  If not, identify all documents evidencing, relating to, or supporting your assertion that such did not occur.

[Dkt. 118-5 at 8.]  Request for Production No. 3 requests the documents that are identified in response to Interrogatory No. 11.

Kapsch's supplemental response to Interrogatory No. 11 reads:

Kapsch states that it is probable that some individuals were assessed, charged, invoiced, or provided notice to pay administrative fees or penalties in a second (or other later) Notice of Toll where said individual(s) did not receive a first Notice of Toll.  Pursuant to Fed. R. Civ. P. 33(d), Kapsch directs Plaintiff to both Kapsch and Gila's business records, KTC_02948__GILA-BARKER-002595 CONFIDENTIAL.xlsx. for impacted users and due refunds.  Gila's database also contains responsive information, and specific queries to determine this information may be accessed through counsel for Gila.

*Id.* at 9.  Plaintiffs argue that it is improper for Kapsch to "refuse to definitively answer whether individuals were sent 2nd or later Toll Notices without having the requisite 1st Toll Notice.  Internal records produced in this litigation evidence that Kapsch **knows** this has happened and to tens or hundreds of thousands of individuals."  [Dkt. 118 at 18.]  As the Court has noted before in this case, the proper mechanism to force an opponent to definitively admit or deny a fact is, of course, a request for admission, not an interrogatory.  Kapsch was not required to definitively "admit" anything in response to this interrogatory.

Plaintiffs also argue that the document Kapsch refers to in addition to Gila's Titanium Database "appears to be an outdated analysis from 2018" that is incomplete. [Dkt. 118 at 18-19.] In its response to the instant motion, Kapsch explains:

> [T]he best, most complete source of this data is Gila's Titanium database. Gila was responsible for maintaining and storing this information, not Kapsch. It is wholly unsurprising that the data in Kapsch's possession outside the database is incomplete. What Plaintiffs seem to want—an entirely separate cache of responsive data in Kapsch's sole possession—simply does not exist. The document Kapsch cited to is the only responsive data in its possession.
>
> Plaintiffs have—and have had, for months—the entire universe of data that responds to this Interrogatory. In fact, Gila first produced the database on September 13, 2019; Kapsch produced an updated version on August 14, 2020; and Gila produced yet another updated version on February 12, 2021. The database itself is searchable by query, which Plaintiffs' counsel is fully able to do. Moreover, the document bearing Bates label GILABARKER-049942 is a large Excel spreadsheet that identifies all customers included in Gila's proposed remediation and contains multiple categories of information for each customer. (Ex. 3, Gila Interrog. Response, p. 26.) That information is sortable and searchable and should meet every possible need Plaintiffs may have. There is nothing in Kapsch's possession that could possibly add to this data.

[Dkt. 124 at 17.] Again, if Plaintiffs have not been given the ability to access the Titanium Database using the same interface that Kapsch and Gila use to access it in the ordinary course of business, then Kapsch has not complied with Rule 33(d). Kapsch must either provide that ability to Plaintiffs or provide a full and complete response to Interrogatory No. 11 without invoking Rule 33(d) **within 14 days of the date of this Order**.

Finally, Plaintiffs also note that, in the course of briefing the class certification issue, Kapsch argues that whether a given person received a second notice without receiving a first notice cannot necessarily be determined from the Titanium Database. Kapsch stated:

> While some of Defendants' records suggest certain individuals may not have been sent certain notices (and for purposes of the remediation plan it is being assumed out of an abundance of caution that the notices were not sent), those business records themselves are not definitive. Indeed, some individuals who Defendants

> could not confirm had been sent such a notice actually made timely payments, suggesting that they were notified, and clearly showing that they were not injured. (Kennedy Dec. ¶¶ 21-22.) To that extent, Plaintiffs seek to litigate what appears to be an internal record-keeping anomaly that had no impact on any putative class member. Thus, contrary to Plaintiffs' repeated claim that class litigation could be conducted by simply reviewing Defendants' records, there would be a need for individualized inquiry to determine who in fact did not receive a notice.

[Dkt. 93 at 55-56.] While the Plaintiffs' frustration with this argument is understandable, it does not contradict Kapsch's assertion that the Titanium Database is "the universe of relevant information and documents that are responsive to Interrogatory 11 and RFP 3." [Dkt. 124 at 18.] It is not clear to the Court what "individualized inquiry" Kapsch believes would produce better evidence than Gila's contemporaneous business records, but it is clear that Kapsch does not have any better evidence than those records at this time.

### 4. Interrogatory No. 2

Interrogatory No. 2 reads:

> Identify all individuals who have or may have knowledge or information related to any of the matters alleged in the Complaint, or your Answer or Affirmative Defenses thereto, including but not limited to any claims or defenses of the parties, and for each such person provide a detailed description of that person's knowledge or information and identify any documents in his/her possession relevant to this litigation.

[Dkt. 124-22 at 2-3.] In the *Barker* Order, the Court overruled Kapsch's objections to this interrogatory and ordered Kapsch provide a complete and unequivocal response to it. Plaintiffs argue that

> Kapsch has now identified a lengthy list of individuals . . ., but has refused to identify documents as requested in this Interrogatory and has provided only general descriptions of the information known to a fraction of those individuals. Defendants' descriptions and identification of documents largely fail to provide information that would allow Plaintiffs to identify specific witnesses with information relating to the issues in this matter.

24

[Dkt. 118 at 23.]  As the Court recognized in the *Barker* Order, as to those individuals who are not employees of Kapsch, Kapsch may be unaware of what documents they possess or what specific information they have and may not have contact information for the individual.  With regard to Kapsch's employees, the Court finds that Kapsch's descriptions, while certainly very general, are adequate.[7]

Plaintiffs further complain that Kapsch has failed to identify what documents are possessed by each listed individual.  Kapsch instead has identified generally "its business records, Bates labeled KTC_11996_CONFIDENTIAL through KTC_15741_CONFIDENTIAL" and "Gila's business records, Bates labeled KTC_01574_GILABARKER000001 through KTC_08173_GILA-BARKER-PROD14_export and KTC_18518_crs5_oltp.bak," as well as the document productions of certain non-parties, as being responsive to this interrogatory.  *See* [Dkt. 124-22 at 3-15].  With regard to Kapsch's own current or past employees, the Court finds this to be adequate if the employee in question is one of the custodians whose records have been searched and produced as kept in the usual course of business and Kapsch certifies that all

---

[7] The example given by Plaintiffs of information that they believe should be included in the response to Interrogatory No. 2 demonstrates that Plaintiffs' expectations exceed Kapsch's obligations in responding to this type of general interrogatory.  Plaintiffs point to a footnote in Defendants' brief opposing class certification [Dkt. 93 at 48], n.13) that reads:  "The factual record reflects that the RiverLink system configuration logic provides—as approved by the States—that invoices were due to be paid within 30 days from the invoice milestone date." Plaintiffs complain that Defendants "have not identified the specific individual(s) at the States that Plaintiffs could interview or depose to corroborate (or not) Defendants' assertions and/or who have documents relating to this issue that could be subpoenaed."  [Dkt. 118 at 24.]  That type of specificity is simply beyond the scope of Interrogatory No. 2.  If Plaintiffs want additional information regarding the States' approval of the RiverLink system configuration logic, they will need to conduct discovery on that issue; perhaps by serving a specific interrogatory on that topic or by deposing James Kennedy, the individual whose declaration is cited in supported of the footnote at issue.  *See* [Dkt. 93-1].

relevant documents possessed by each current employee are included in the referenced business records.   With regard to individuals who are not current or past employees of Kapsch, Kapsch cannot be expected to know what documents each individual possesses.

### III.  Request for Sanctions

In addition to the issues addressed above, the overarching issue raised in the instant motion is simply that Kapsch has failed to completely respond to discovery requests that were served on April 4, 2019—over two years ago—and January 16, 2021—over seven months ago. Kapsch was ordered to serve complete and unequivocal supplemental responses to Plaintiffs' first set of discovery requests by September 4, 2020; there is no question that it did not do so.  As of the date of Kapsch's response to the instant motion, March 30, 2021, Kapsch summarized the state of its discovery responses as follows:

> Kapsch has produced (1) the "big" production responsive to the First RFPs; (2) the Eichers documents through 2017; (3) a supplemental privilege log updating the one submitted by Kapsch's prior counsel; and (4) all financial documents responsive to the Second RFPs.  Still in the works are the remainder of the production responding to the Second RFPs, the remaining Eichers production, and privilege logs covering the big production and the Eichers productions.

[Dkt. 124 at 9] (footnote omitted).

Plaintiffs' frustration with the slow pace of Kapsch's discovery efforts is palpable, both in the discovery reports quoted in the Background section above and in their briefs, which provide even more detail regarding Plaintiffs' efforts to obtain complete discovery responses from Kapsch.  The Court shares that frustration, and is frankly disappointed by the generally cavalier attitude toward its discovery obligations evidenced in Kapsch's briefs.  Kapsch's choice to go on the offensive and accuse Plaintiffs of "myopically" focusing on the September production and "fixating" on "irrelevant minutiae," [Dkt. 150 at 1], in the face of Kapsch's extraordinary delay in

completing its document production, is unfortunate.  The vast breadth of Plaintiffs' requests, the parties' discussions regarding what search terms should be used,[8] and the change of counsel explain some of the delay.  However, as the Court expressed to Kapsch during a status conference, Kapsch's failure to complete its production is due in large part to a simple failure to devote sufficient resources to the task.  That ends now.  **Within fourteen days of the date of this Order Kapsch shall provide complete and unequivocal responses to both sets of Plaintiffs' discovery requests, complete its document production, and provide the affidavit regarding their privilege log ordered above and shall file a certification pursuant to the penalties for perjury that it has done so.  If Kapsch fails to comply with this Order fully and completely, the Court will recommend imposition of a sanction of $1,000.00 per day, beginning on the fifteenth day after the entry of this Order, until Kapsch complies**.

Plaintiffs conclude their opening brief as follows:

Kapsch has failed to comply with the rules of this Court as well as the express Orders of this Court, and has done so in a manner that demands sanctions. Further, given the ongoing and severe nature of Kapsch's discovery misconduct, and the repeated chances and warnings provided by Plaintiffs and the Court in attempting to resolve these issues without more severe resorts, the Court should now find that only severe sanctions will curb Kapsch's refusal to comply with its obligations in this Court.  Plaintiffs request that the Court issue severe sanctions against Kapsch

---

[8] Kapsch complains that once its new counsel appeared and decided to redo what it terms its "big production," Plaintiffs refused to engage in conversation about search terms and that "Kapsch, watching the clock tick and seeing no other options, finally decided to perform a search of the data using search terms that had been agreed to between Plaintiffs and Gila and that Plaintiffs used in their non-party requests for production." [Dkt. 124 at 2.]  Plaintiffs strongly dispute that characterization of events and point to the fact that Plaintiffs and Kapsch agreed to search terms in September 2020, before new counsel appeared. [Dkt. 129 at 3-7.]  Plaintiffs' position is supported by the both the parties' discovery status reports and the correspondence between counsel contained in the exhibits submitted in conjunction with the instant motion, *see id.* (citing relevant exhibits), and Kapsch's assertion that a substantial portion of the delay in its production was caused by Plaintiffs' failure to engage in the discovery process is simply not borne out by the record.

pursuant to Rule 37 and the Court's inherent powers that include the striking of Kapsch's claims of privilege, an order compelling complete and unequivocal responses to Plaintiffs' discovery requests (including any documents previously withheld on assertions of privilege), the striking of Kapsch's Answer and Affirmative Defenses, an entry of default judgment against Kapsch on the claims set forth in Plaintiffs' Complaints, and any other sanctions the Court deems necessary and reasonable.

[Dkt. 118 at 34-35.]  However, Plaintiffs do not even attempt to demonstrate that Kapsch's behavior merits entry of default and/or striking of affirmative defenses.  The discussion in Plaintiffs' reply brief is a bit less conclusory, but it still lacks any discussion of the circumstances under which such sanctions are appropriate and does not cite to any case in which such sanctions were found to be warranted for the type of conduct present in this case.  While Kapsch's conduct has fallen far short of what the Court expects from litigants, Plaintiffs have failed to support their request for the sanctions of entry of default and/or the striking of affirmative defenses.

That said, however, given Kapsch's indisputable failure to comply with the *Barker* Order and its failure to respond to Plaintiffs' second set of discovery requests in a timely manner, Plaintiffs are entitled to an award of attorney's fees that encompasses all of their efforts to obtain discovery from Kapsch.  *See* Fed. R. Civ. P. 37(a)(5)(A) (governing fee awards when motion to compel is granted); Fed. R. Civ. P. 37(b)(2)(C) (governing fee award when party fails to obey a discovery order).  This includes the briefing of Plaintiffs' motion to compel in the *Barker* Action, the briefing of the instant motion, and all of the time Plaintiffs' counsel spent on meet-and-confer efforts with Kapsch from September 4, 2020, through the date of this Order.  It also includes all of the time Plaintiffs' counsel spent reviewing Kapsch's initial large document production that was made in September 2020.  Plaintiffs shall file a motion for attorney's fees with appropriate documentation **within twenty-one days of the date of this Order**.

## IV.  Conclusion

For the reasons and to the extent set forth above, Plaintiffs' motion [Dkt. 117] is

**GRANTED** as set forth herein.  Plaintiffs' motion to file a supplemental reply [Dkt. 145] is

**GRANTED**.

SO ORDERED.

Dated:  19 AUG 2021

_____
Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically on all
ECF-registered counsel of record via email
generated by the Court's ECF system.