# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | |
|---|---|
| MONIQUE OUTZEN individually and on behalf of all others similarly situated, ROBERT ARDAIOLO individually and on behalf of all others similarly situated, and MELISSA BARKER an individual, on behalf of herself and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> KAPSCH TRAFFICCOM USA, INC., and GILA, LLC, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. 1:20-cv-01286-TWP-MJD |

## ENTRY ON PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION

This matter is before the Court on an Amended Motion for Class Certification filed by Plaintiffs Monique Outzen ("Outzen"), Robert Ardaiolo ("Ardaiolo"), and Melissa Barker ("Barker") (collectively, "Plaintiffs"), all individually and on behalf of all others similarly situated (Filing No. 77). Outzen and Ardaiolo filed their eight-claim putative class action complaint against Defendants Kapsch TrafficCom USA, Inc. ("Kapsch") and Gila, LLC ("Gila") (collectively, "Defendants") (Filing No. 1-2), and the Court eventually consolidated their case with a similar one brought by Barker, noting that both involved common questions about similar factual allegations (Filing No. 44 at 1–2). Later, the Court denied Defendants' Joint Motion to Dismiss Outzen and Ardaiolo's Complaint (Filing No. 115). Meanwhile, Plaintiffs—after Barker was brought into this case—filed the amended Motion at bar. For the following reasons, the Court **denies** Plaintiffs' Motion to amend the class.

# I.     **BACKGROUND**[1]

RiverLink is a collaborative tolling system instituted by Indiana and Kentucky (collectively, "the States") to build, maintain, and improve multiple bridges spanning the Ohio River that connect both Indiana and Kentucky (Filing No. 76-1 at 5; 76-10 at 1). Kapsch was awarded the contract to act as the Toll Services Provider ("TSP") for RiverLink (Filing No. 76-2 at 13–14) and later hired Gila to act as its agent to, among other things, provide a "Back Office System" and create a "Customer Service Center." (Filing No. 76-3 at 49–51.) RiverLink uses all-electronic tolling, meaning that tolls are collected one of two non-traditional ways under Business Rules adopted by the States (Filing No. 76-5 at 6). Section 135 Ind. Admin. Code 4-1-1 defines Business Rules as " a set of policies and procedures established from time to time by the tolling body pursuant to a toll policy agreement of the states' parties that defines how the toll transactions will be processed.". Thus, RiverLink users can create Registered Vehicle Accounts ("RVAs") that automatically debit accounts when sensors detect their provided transponders traversing the bridges (Filing No. 76-5 at 14).

Relevant to this action—for motorists without RVAs, or for those with RVAs carrying inadequate balances to pay a toll—cameras photograph license plate information of the passing cars and Unregistered Vehicle Accounts ("UVAs") are created. *Id.* at 15. The owners of these vehicles, as identified by the Indiana Bureau of Motor Vehicles ("IN BMV") or Kentucky Motor Vehicle Licensing ("KY MVL"), will receive an invoice for the unpaid toll, known as a "1st Toll Notice," through the mail. *Id.* at 46. If the invoice goes unpaid for thirty-five days, drivers are to be mailed a "2nd Toll Notice," which this time includes an additional $5.00 administrative fee/penalty. *Id.* at 46, 47, 15 ("The invoice due date will be [35] Days from the notice generation

---

[1] This background section should look largely familiar to the parties because, in drafting this section, the Court modeled it after the background section of the Court's Entry Denying Defendants' Motion to Dismiss.

date. This allows for 5 Days for invoice generation, quality control and review, and mailing + 30 Days for Customer to make payment.") (emphasis removed).  If the 2nd Toll Notice is not paid within twenty days, drivers will receive a "Violation Notice," which includes the unpaid toll, a $5.00 administrative fee/penalty from the 2nd Toll Notice, and an additional $20.00 fee/penalty. *Id.* at 47, 15.  In particular "[i]f owner fails to pay 1st Toll Notice, the 2nd Toll Notice is sent within [7] Days of the initial invoice due day, adding the 2nd Unregistered Video Account Invoice Administration fee to the second invoice. New payment due date is [20] Days from generation of second invoice." (emphasis removed). *Id.*  If the driver does not pay the Violation Notice within thirty days, they will be sent a "Collection Notice," which, in addition to all the charges outlined in the Violation Notice, includes an additional $30.00 collections penalty/fee. *Id.* at 47, 15.  This provision provides:

> If payment is not made after the 2nd Toll Notice, a Violation (failure to pay) Notice shall be generated within 7 Days of the payment due date from the 2nd invoice.
>
> This notice will assess a violation invoice administration fee per violation invoice, totaling the cumulative, combined amount of tolls and fees, and requiring payment within [30 Calendar] Days of violation notice generation..

*Id.* (emphasis removed).

Finally, if a Collection Notice is not paid, additional fees may be assessed, collection efforts (including litigation) may be instituted, and a hold may be placed on the vehicle's registration with the IN BMV or KY MVL, which can only be lifted upon full payment of the penalty/fee.  *Id.* at 47 ("The Violation Notice will state that failure to pay by the date specified will result in additional enforcement actions by the toll operator or the Tolling Body Representatives, including notification of the DMV and a hold on registration renewal, collection agency referrals, and possible court actions.").

Unfortunately, Defendants did not follow this protocol, and instead have consistently mailed 1st Toll Notices with a due date of 30 days after the invoice date, which is earlier than contemplated by the Business Rules (35 days after generation date) (Filing No. 76-9 at 27–28, 61–62).[2] Additionally, Defendants have assessed fees and penalties on some customers before a 1st Toll Notice was even sent at all (*see* Filing No. 76-15 at 2 ("Total 'Confirmed Not Sent' should end up around 6.5%.")). For their parts, after Outzen and Barker used the bridges as UVA customers, they received 2nd Toll Notices—but never 1st Toll Notices—and were charged $5.00 administrative fees/penalties (Filing No. 76-26 at 1–2; Filing No. 76-25 at 1–2).

Outzen and Barker, accordingly, were never afforded the appropriate windows to pay their tolls without fees (Filing No. 76-26 at 2; Filing No. 76-25 at 2). Unlike Outzen and Barker, however, Ardaiolo *was* provided a 1st Toll Notice after using the bridge (Filing No. 76-27 at 1–2). But that notice did not comply with the requirement to give him the requisite thirty-five days to pay his toll, and Ardaiolo later also received a 2nd Toll Notice (including the additional $5.00 fee). *Id.* at 2. To avoid incurring additional penalties and fees, Outzen, Barker, and Ardaiolo all paid the full amount due pursuant to their respective 2nd Toll Notices (Filing No. 76-26 at 2; Filing No. 76-25 at 2; Filing No. 76-27 at 2).

Meanwhile, Defendants and the States identified some of these widespread issues and started the ongoing process of planning for remediation, which resulted in the suspension of some fees and penalties as well as the furnishing of refunds to affected customers (Filing No. 93-1 at 6). The States, however, have not yet globally signed off on the plans. *Id.* at 6–7. To this end, Defendants have offered all contested fees or penalties charged to Outzen and Barker as refunds

---

[2] Defendants, however, apply a five-day grace period for late payments following a 1st Toll Notice (*see* Filing No. 93-1 at 5).

(see Filing No. 100-1 at 1–2; Filing No. 100-2 at 15).[3]  These offers, however, have remained rebuffed.  *See id.*

Plaintiffs eventually sued Defendants for unjust enrichment (Count I), money had and received (Count II), fraud (Count III), violation of the Indiana Deceptive Consumer Sales Act ("IDCSA") (Count IV), deception or intentional misrepresentation (Count V), negligence (including negligent misrepresentation and negligence per se) (Count VI), constructive fraud (Count VII), and breach of fiduciary duty (Count VIII), for alleged violations stemming from their operation of the electronic toll collection system over the Ohio River bridges (Filing No. 1-2).[4]  Later, the Court denied Defendants' Motion to Dismiss (*see* Filing No. 115) after Plaintiffs filed this Amended Motion for Class Certification (Filing No. 77).  Defendants filed a Motion for Leave to File Notice of Supplemental Authority, which the Court now **grants** (Filing No. 172).[5]

## II.   LEGAL STANDARD

Class action lawsuits are governed by Federal Rule of Civil Procedure 23, and a party seeking class certification bears the burden of proof in establishing each of the requirements under this rule. *Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 90 (7th Cir. 1977). The failure to satisfy any one of these elements precludes certification. *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 596 (7th Cir. 1993). The Court has broad discretion to determine whether certification is appropriate. *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008).  In deciding whether to certify

---

[3] At some point a RiverLink account was opened on Barker's behalf after she was told by a RiverLink employee that this step was necessary to halt fees and penalties being assessed against her (Filing No. 100-1 at 1). Into this account Defendants deposited her refund credits. *Id.* Later still, this account was inadvertently used when the linked vehicle crossed the bridges. *Id.* at 1–2. Barker maintains, however, that had she known that this account could be used in that way and "that Riverlink was offering [her] some sort of settlement, [she] would not have agreed to allow tolls to be paid them using the account." [sic] *Id.* at 2.

[4] Again, the Court consolidated cases brought by (1) Barker and (2) Outzen and Ardaiolo.

[5] The Court, in addition to this supplemental authority, will consider Plaintiffs' filed response (Filing No. 175-1).

a class, the Court is not required to accept the allegations in the complaint as true. *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676–77 (7th Cir. 2001).

While consideration of class certification is not "a dress rehearsal for the trial on the merits," the court "must receive evidence and resolve the disputes before deciding whether to certify the class." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012) (quoting *Szabo*, 249 F.3d at 676). The court should make any factual and legal inquiries needed to ensure that the requirements for class certification are satisfied even if the underlying considerations overlap with the merits of the case. *Szabo*, 249 F.3d at 676. In evaluating class certification, the court must take into consideration the substantive elements of a plaintiff's claim, inquire into the proof necessary for the various elements, and envision the form that trial on the issues would take. *See Simer v. Rios*, 661 F.2d 655, 672 (7th Cir. 1981).

## III.   DISCUSSION

The Court will evaluate whether Plaintiffs' claims meet the specific standards of Rule 23 after engaging in a threshold choice of law analysis.[6, 7]

---

[6] Defendants also preliminarily argue that "Plaintiffs have not demonstrated that absent class members of the damages class have Article III standing to assert their claims." (Filing No. 93 at 26–27.) But the Seventh Circuit has made clear that "putting the cart before the horse in that way would vitiate the economies of class action procedure; in effect the trial would precede the certification." *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 676 (7th Cir. 2009) ("[A]s long as one member of a certified class has a plausible claim to have suffered damages, the requirement of standing is satisfied.") (citation omitted).

[7] Defendants additionally maintain that "the Fourteenth Amendment prevents this Court from asserting personal jurisdiction over Defendants with respect to each claim for which the putative class member in question is located outside of, and not injured in, Indiana," citing *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cty.*, 137 S. Ct. 1773 (2017) ("*BMS*"), in support (Filing No. 93 at 60). But—as recognized by Defendants—"the Seventh Circuit held recently that the Supreme Court's analysis in *BMS* is limited to mass actions, and does not apply to Rule 23 class action matters." *Id.* (citing *Mussat v. IQVIA, Inc.*, 953 F.3d 441, 447–48 (7th Cir. 2020)). This Court, of course, will decline Defendants' invitation to apply other circuits' contrary interpretation of *BMS*. *See id.* ("[O]ther circuit courts have declined to reach this conclusion."), 61 ("Defendants respectfully preserve their challenge to the Court's exercise of personal jurisdiction over claims brought by out-of-state class members."); *see also* Filing No. 100 at 10–11 ("Defendants concede that personal jurisdiction over absent class members is not required under Seventh Circuit precedent" and also "have waived any argument that this Court lacks personal jurisdiction over non-Indiana resident's claims.").

A.      **Choice of Law**

At the outset, Defendants maintain that "[b]efore analyzing Plaintiffs' claims to determine

whether they meet Rule 23's exacting standard, the Court must first conduct a choice-of-law

analysis for each claim, and for each Plaintiff (including each putative class member)."  (Filing

No. 93 at 28 (citing *In re LifeUSA Holding Inc.*, 242 F.3d 136, 147 (3d Cir. 2001); *Clay v. Am.

Tobacco Co.*, 188 F.R.D. 483, 498 (S.D. Ill. 1999)).)  After conducting this analysis, Defendants

argue, the Court will discover "the impracticability of resolving this matter through class

proceedings." *Id.* at 29.  In a case within federal diversity jurisdiction, a federal district court

applies the choice of law rules of the forum state.  *Land v. Yamaha Motor Corp., U.S.A.*, No. IP

00-220-C H/G, 2001 WL 243296, at *2 (S.D. Ind. Mar. 8, 2001) (citations omitted).  Accordingly,

the Court will apply Indiana's choice of law rules.

Defendants group Plaintiffs' claims into four categories, three sounding in tort—(1) fraud-

based claims (for fraud, violation of the IDCSA, deception/intentional misrepresentation, and

constructive fraud), (2) negligence claim, and (3) breach-of-fiduciary-duty claim—and the other

category of claims sounding in equity—unjust enrichment claim and money-had-and-received

claim).  The Court finds this organization useful for evaluative purposes and will use it in making

a determination of which state's law governs.  First, the tort claims.

> [I]n tort cases Indiana's choice-of-law analysis now involves multiple inquiries. As
> a preliminary matter, the court must determine whether the differences between the
> laws of the states are important enough to affect the outcome of the litigation. If
> such a conflict exists, the presumption is that the traditional *lex loci delicti* rule (the
> place of the wrong) will apply. Under this rule, the court applies the substantive
> laws of the state where the last event necessary to make an actor liable for the
> alleged wrong takes place.
>
> This presumption is not conclusive, however. It may be overcome if the court is
> persuaded that the place of the tort bears little connection to this legal action.
>
> If the location of the tort is insignificant to the action, the court should consider
> other contacts that may be more relevant, such as: 1) the place where the conduct

> causing the injury occurred; 2) the residence or place of business of the parties; and 3) the place where the relationship is centered. These factors are not an exclusive list nor are they necessarily relevant in every case. All contacts should be evaluated according to their relative importance to the particular issues being litigated. This evaluation ought to focus on the essential elements of the whole cause of action, rather than on the issues one party or the other forecasts will be the most hotly contested given the anticipated proofs.

*Simon v. United States*, 805 N.E.2d 798, 804–05 (Ind. 2004) (quotations and citations omitted).

The Court initially determines that the "differences between the laws of the states are important enough to affect the outcome of the litigation." *Id.* at 804. As argued by Defendants, "the Court must apply the laws of nearly all 50 states" if looking purely at "the states in which the toll notice was received and where class members purportedly suffered injury." (Filing No. 93 at 43.)   Among these myriad laws, assuredly, differences sufficing to alter the suit's resolution abound, and the Court need not delve into exhaustively parsing those distinctions. *See generally id.* at 29–36.[8] Second, Plaintiffs do not dispute that the "place of the tort," as described above, is located "where Class Members opened their mail and/or paid Defendants." (*See* Filing No. 79 at 46; Filing No. 93 at 37; Filing No. 100 at 24.) Again, these "places" number nearly fifty. Where the parties differ, however, is in interpreting the relative significance of these various locations to the case.

---

[8] *See, e.g.*, *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1018 (7th Cir. 2002) ("Because [fraud] claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable."); *Matter of Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1301 (7th Cir. 1995) ("The voices of the quasi-sovereigns that are the states of the United States sing negligence with a different pitch."); *Church v. Consol. Freightways, Inc.*, No. C-90-2290 DLJ, 1991 WL 284083, at *12 (N.D. Cal. June 14, 1991) ("Given the number of causes of actions"—including a claim for breach of fiduciary duty—and "the jurisdictions involved, . . . the number of resolutions this Court must make even before approaching the merits of the action as to which law to apply is overwhelming. On this issue alone, then, a class action is not the superior method of adjudicating the interests implicated as determination of the choice of law issue would require numerous 'mini-trials' in and of itself."); *Muehlbauer v. Gen. Motors Corp.*, No. 05 C 2676, 2009 WL 874511, at *6 (N.D. Ill. Mar. 31, 2009) ("[I]f plaintiffs had looked deeper than the general elements, they would have discovered that there are differences among the states with regard to unjust enrichment that preclude class treatment—whether as a national class or in a class subdivided into two groups. The nuances of state law in this area are simply too varied.").

Defendants insist that "applying the three factors that Indiana courts consider if the place of the tort 'bears little connection to the legal action' [ ] counsels against applying Indiana law to Plaintiffs' nationwide classes." (Filing No. 93 at 38) (citing *Hubbard Mfg., Inc. v. Greeson*, 515 N.E.2d 1071, 1073 (Ind. 1987) (factors are (1) "the place where the conduct causing the injury occurred," (2) "the residence or place of business of the parties," and (3) "the place where the relationship between the parties is centered")).  To Defendants:

> the first factor (the place where the conduct causing the injury occurred) purportedly occurred in Pennsylvania, the state from which the toll notices that are the subject of Plaintiffs' Complaint were mailed.  The second factor (the residence of the parties) points to Texas and Virginia, respectively, for the Defendants, and each of the nearly 50 states represented by various putative class members.  The third factor (the place where the relationship between the parties is centered) likewise focuses on the residence of the putative class members; it is the place where the allegedly-defective toll notices were sent, the place where the putative class members purportedly suffer harm, and the place from where the putative class members made payments.

*Id.* (citations removed).

 While conceding that "the location of the tort is where Class Members opened their mail and/or paid Defendants," Plaintiffs' argue that this location "has no bearing at all on the lawsuit." (Filing No. 100 at 24.) In fact, opening mail and paying Defendants "is merely the last step in a transaction that was agreed to and performed in Indiana."  *Id.* Moreover, the ability to pay or receive tolls anywhere "only prove[s] Plaintiffs' point that regardless of where Class Members receive their mail or pay Defendants, it has no bearing on either parties' obligations and no significance to this case." *Id.* at 25. And while *In re Bridgestone/Firestone* underscored "the difficulty of aggregating consumer transactions into a nationwide class action under a single state's law when the parties enter those transactions in a multitude of forums and their conduct is governed by a multitude of conflicting laws", all transactions here occurred "in Indiana and Indiana law governed [Defendants'] conduct."  *Id.* at 26.

The Court agrees with Plaintiffs: the "place of the tort" here is insignificant in that the location where putative class members open their mail or pay their tolls "bears little connection to the legal action." *Simon*, 805 N.E.2d at 806 (quotation omitted). Instead, both "the place where the conduct causing the injury occurred" and "the place where the relationship between the parties is centered" is Indiana. *Id.*; *cf. In re Bridgestone/Firestone, Inc.*, 288 F.3d at 1016 ("Financial loss (if any, a qualification we will not repeat) was suffered *in the places where the vehicles and tires were purchased* at excessive prices or resold at depressed prices. Those injuries occurred in all 50 states, the District of Columbia, Puerto Rico, and U.S. territories such as Guam.") (emphasis added). "The residence or place of business of a party," on the other hand, "while important in cases involving family law or asset distribution, is not a particularly relevant contact in this case." *Id.* at 807. Although "[t]his is not a comprehensive list, of course, and other relevant factors may be considered" when determining what state's laws to apply, this Court, like the Indiana Supreme Court in *Simon*, sees "no others that are particularly pertinent in this case." *Id.*

Though Defendants point to the number of states where putative class members reside ("nearly 50") and pepper the Court with other purportedly important states to this action—such as where toll notices are printed (Pennsylvania) and where Defendants reside (Texas and Virginia)— the Court does not find these contentions persuasive because these states are so tenuously related to the "gravamen of this case." *Id.* at 806. In *Mathis v. Metro. Life Ins. Co.*, No. 1:18-CV-01893-JRS-DLP, 2019 WL 1409464, at *5 (S.D. Ind. Mar. 28, 2019), ("Mathis resided in Alabama and worked in Alabama. He was licensed under Alabama law to practice in the State of Alabama. He presumably relied on Moore's representations while Mathis was located in Alabama. Mathis obtained the Policy to insure income he earned in his occupation in Birmingham, Alabama. Mathis lived in Alabama when the Policy was issued and the Policy was delivered to him there. His

economic losses—at least some of them—were sustained while he was in Alabama."), *aff'd*, No. 20-2719, 2021 WL 3851936 (7th Cir. Aug. 30, 2021). In *Coldren v. Am. Gen. Life Ins. Co.*, No. 3:12-CV-28-RLY-WGH, 2012 WL 6045592, at *4 (S.D. Ind. Dec. 5, 2012), ("Plaintiffs are Florida residents; their initial contact with American General was through a Florida resident; and Plaintiffs relied on Rasche's representations and rendered consideration in Florida.") (citations omitted). To be sure, only "rare cases" should overcome the presumption of *lex loci delicti*. *Simon*, 805 N.E.2d at 806. But, because of the unique circumstances of the events underlying this suit, the Court determines that this is one of those exceptions and instead finds that Indiana "has the most significant relationship with the action." *Id.* at 803. Thus, Indiana's substantive tort law applies.

On to the equitable claims. This will be a rather short analysis because, as noted by Defendants (*see* [Filing No. 93 at 41](#)), this Court has applied *Simon*'s tort-based rationale to claims rooted in equity:

> Regarding the choice of law to apply in deciding the claims for equitable relief, the Court first must determine if there is a conflict among the states' laws regarding the equitable claims. If there is a conflict that could affect the outcome of the litigation, then the Court will apply "the substantive laws of the state where the last event necessary to make an actor liable for the alleged wrong takes place."

*Mall at Potomac Mills, LLC v. Control Bldg. Servs., Inc.*, No. 1:14-CV-00099-TWP, 2015 WL 329181, at *4 (S.D. Ind. Jan. 22, 2015) (quoting *Simon*, 805 N.E.2d at 805). And, of course, *Simon* goes on to explain that this presumption of application "may be overcome if the court is persuaded that the place of the tort bears little connection to this legal action." 805 N.E.2d at 805 (quotations omitted). Indiana law also applies to the equitable claims. For the same reasons the Court has found that Indiana "has the most significant relationship with the action," it would reach the same result if applying the "most intimate contacts rule" in relation to the equitable claims if they were

to be considered "quasi-contractual" in nature (*see* [Filing No. 79 at 50](#)–51; [Filing No. 100 at 29](#)–31) .[9]

**B.**   <u>**Class Certification**</u>

Pursuant to Rule 23, the named parties of a class of plaintiffs may sue on behalf of all the members of a class if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Courts must conduct "a rigorous analysis" to determine whether the requirements of Rule 23(a) have been satisfied. *Davis v. Hutchins*, 321 F.3d 641, 649 (7th Cir. 2003); *General Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 160 (1982) ("[A]ctual, not presumed, conformance with Rule 23(a) remains . . . indispensable."). As Defendants attack only the last two of these four requirements, the Court will largely limit its analysis to these considerations.[10] "A claim is typical if it 'arises from the same event or practice or course of conduct that gives rise to the claims of other class members and . . . [plaintiff's] claims are based on the same legal theory.'" *Oshana v. Coca-Cola*, 472 F.3d 506, 514 (7th Cir. 2006). "The typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983). "Typical does not mean identical, and the typicality requirement is liberally construed." *Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 57 (N.D. Ill. 1996).  As for Rule

---

[9] Quoting *Nat'l Union Fire Ins. Co. v. Std. Fusee Corp.*, 940 N.E.2d 810, 814 (Ind. 2010) (instructing that courts should consider "(1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties").

[10] That said, the Court finds that Plaintiffs, for the reasons stated in their lead brief, have established by a preponderance of the evidence the "numerosity" and "commonality" elements required by Rule 23(a) as to each subclass (*see* [Filing No. 79 at 34](#)–37; *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1025 (7th Cir. 2018)).

23(a)(4)'s so-called "adequacy" requirement, "[a] named plaintiff must be a member of the putative class and have the same interest and injury as other members." *Beaton*, 907 F.3d at 1028.

"To be certified, a proposed class must [also] satisfy . . . one of the three alternatives in Rule 23(b)." *Messner*, 669 F.3d at 811.  Here, Plaintiffs proceed pursuant to Rule 23(b)(3), which is met if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." "[P]ertinent" considerations include: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

Finally, Rule 23 also requires that "classes be defined clearly and based on objective criteria." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015). A class definition satisfies the "established meaning of ascertainability by defining classes clearly and with objective criteria." *Id.* at 672. "[C]lass definitions generally need to identify a particular group, harmed during a particular time frame, in a particular location, in a particular way." *Id.* at 660. Moreover, courts may certify "particular issues" for class treatment, and "a class may be divided into subclasses that are each treated as a class." Fed. R. Civ. P. 23(c)(4), (5). Because Plaintiffs define three separate subclasses (including an issue class), the Court will address each subclass individually.  *See Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 599 (7th Cir. 1993) (explaining that "[s]ubclasses must satisfy the class action requirements before they may be certified"). But because Plaintiffs generally argue in both their opening and reply briefs that *all*

their proposed classes meet Rule 23's requisite demands—instead of explaining how these discrete requirements apply to each individual class—the Court must first summarize these blanket arguments.

Plaintiffs argue that their class claims "arise from the same practice and course of conduct as other Class Members," satisfying Rule 23(a)(3)'s "typicality" requirement (Filing No. 79 at 37.) In short, Plaintiffs, like all putative class members, did not receive a 1st Toll Notice "that allowed them thirty (30) days to pay the toll before being assessed a fee or penalty," and Defendants set the "due date for twenty-nine days from the generation of the Notice." *Id.* at 37, 38. And Plaintiffs' legal claims apply to the "entire Class" when they "seek to hold Defendants accountable for their illegal imposition of fines, and their associated deceptive acts – fines and deceptive acts that were uniformly imposed on and affected all Class Members." *Id.* at 38.

Regarding Rule 23(a)(4)'s "adequacy" prerequisite, Plaintiffs maintain that they "have the same interests and suffered the same injuries as the Proposed Class." *Id.* In fact, Plaintiffs contend that they have undoubtedly demonstrated their adequacy of representation: "They have participated in discovery, [ ] Barker has attended a settlement conference (before [ ] Outzen and [ ] Ardaiolo filed suit), each Plaintiff has sat for full-day depositions, and each Plaintiff has stayed involved in this lawsuit." *Id.* at 38–39. Moreover, "counsel is also adequate to represent the class," consisting "of several attorneys from two law firms with ample experience in class actions and other types of complex litigation". *Id.* at 39. This experience is reflected by "successful positions taken in motion practice" and dedication to the case is evidenced by counsel's "willingness to devote the time and resources needed to represent Plaintiff[s] and the Class Members." *Id.*

As for Rule 23(b), Plaintiffs—in addition to discussing how Indiana's choice of law favors certification (*see* Filing No. 79 at 42–51), and arguing that the Court has personal jurisdiction over

14

each Class Member, *see id.* at 40–42—also contend a class action is proper because (1) "common issues drive the Proposed Class," (2) "common issues predominate each Count," (3) the "volume of Class Members and individual amounts in controversy result in Rule 23 being the only efficient vehicle" for adjudicating claims, (4) the "additional" factors under Rule 33(b)provide support, and (5) the ongoing "remediation plan" signified by Defendants is "nonexistant," *id.* at 39–40, 51–60, 60–61, 61–63; Filing No. 100 at 34–38. The Court will discuss these four contentions in turn.

First, common issues drive the "Class" when certification will permit the Court "to determine the lawfulness of millions of transactions in a single trial. That is unquestionable efficiency." (Filing No. 79 at 40 (citing *Butler v. Sears, Roebuck & Co.*, 702 F.3d 359, 362 (7th Cir. 2012))). Moreover, "Plaintiffs' evidence is the same as all Class Members' evidence; Defendants' system parameters, database information, and templated mailings prove all Class Members' claims." *Id.* In short, if Plaintiffs prove their claims, they "prove every Class Members' legal theories." *Id.*; *see also* Filing No. 100 at 34 ("[F]ines need to be returned and the court and/or jury can determine if additional relief is warranted on a class-wide basis.").

Second, common issues drive "each Count" at issue in the case (Filing No. 79 at 51). The "equitable claims"—for unjust enrichment and money had and received—Plaintiffs argue, are "well-suited for class certification because they maintain a common theory for liability and damages determined on a class-wide basis," which will rely on "common evidence." *Id.* at 51, 52. Moreover, with only Indiana law applicable, the claims do not suffer from the same deficiencies as "nationwide lawsuits attempting to cobble several states' laws in a single action." *Id.* at 52 (citing *Vulcan Golf, LLC v. Google Inc.*, 254 F.R.D. 521, 522-533 (N.D. Ill. 2008)).

Plaintiffs also argue that the "fraud claims"—those for fraud, deception, and constructive fraud—involve "the same uniform misrepresentations using virtually identical written materials."

*Id.* at 53 (citing *Rohlfing v. Manor Care*, 172 F.R.D. 330, 338 (N.D. Ill. 1997); *Beagle v. Edgemark Fin. Corp.*, 164 F.R.D. 649, 657-658 (N.D. Ill. 1995)).  Moreover, "Defendants' legal relationship, misrepresentations, knowledge, and advantage are uniform amongst Class Members" when Defendants, with "knowledge or reckless ignorance of the falsity of their misrepresentations," gave all "Class Members incorrect due dates" through "virtually identical form notices."  *Id.* at 54, 55. And "reliance" can be "presumed" since all Class Members were "defrauded by the same acts," *id.* at 54 (citing *Skalbania v. Simmons*, 443 N.E.2d 352, 359 (Ind. Ct. App. 1982)), and Class Members indeed paid the "administrative fees and penalties," leading to a "common-sense" and "logical" inference of reliance, *id.* at 54, 56–57.

In short, "Class Members have no choice but to rely on Defendants" with Defendants informing "Class Members that they must pay fees under Indiana law or suffer escalating penalties and a vehicle registration freeze." *Id.* at 57. *See also* Filing No. 100 at 32–33 (Defendants "do not explain why a Class Member who paid Defendants fees did **not** do so in reliance on Defendants' misrepresentation that the fees were lawful and the money was owed.") (emphasis in original), 34 ("[A]ll Class Members must have seen and believed Defendants' assertion that fees were owed or else they would not have paid them.").

As for their claim under the IDCSA, Plaintiffs maintain that the plain text of that statute permits them to "'bring a class action against [Defendants] on behalf of any class of persons of which that person is a member and which has been damaged by such deceptive act.'" (Filing No. 79 at 58 (quoting Ind. Code § 25-5-0.5-4(b)).)  Additionally, the Plaintiffs argue that—because the Seventh Circuit has instructed that if class-wide "'damages can be estimated, the court next should examine the matters identified in Rule 23(b)(3),'" *id.* (quoting *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 760 (7th Cir. 2014))—class certification is supported when "[e]ach Class Member should

receive the greater of their money back for all fees they paid or $500.00 for each deceptive notice they received," *id.* (citing Ind. Code § 25-5-0.5-4(a)). Moreover, "common evidence" supports that "[e]ach Class Member transacted for the same service or intangible from Defendants," who, in turn, "engaged in the same deceptive acts towards each Class Member." *Id.* at 58. Regarding the negligence and breach of fiduciary duty claims, Plaintiffs again contend that "common issues predominate" over these allegations as well: "Defendants breached their [fiduciary] duty to each Class Member under the same course of conduct." *Id.* at 59. This "negligence," according to Plaintiffs, "subjected each Class Members to illegal fines." *Id.*

Third, Plaintiffs contend that certification "is a superior, and perhaps the only, manner of efficiently litigating these issues." *Id.* at 60. This is especially true since "'the amount of damages to which each plaintiff would be entitled is so small[, so] no one would bring this suit without the option of a class.'" *Id.* (quoting *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1030 (7th Cir. 2018). Indeed, certification permits the grouping of "*millions* of smaller claims to adjudicate them efficiently." *Id.* at 61 (emphasis added). As "the compensatory damages for most of the Class members will be in the tens or hundreds of dollars at most," and even additional damages under the IDCSA are "well below the cost" of litigation, class certification is the "superior vehicle for addressing such unlawful actions." *Id.* at 61, 61 n.29.

Fourth, the quartet of additional factors to be considered under Rule 23(b)(3) support certification.  First, "individual Class members do not wish to control their cases and would benefit from the efficiencies of a class action."  *Id.* at 62.  Second, there is not "any other pending litigation involving the same claims raised in this case."  *Id.*  Third, certification "would facilitate the controversy's comprehensive resolution."  *Id.*  Fourth, "the claims of the Class are easily manageable by the Parties and the Court" since readily available "databases contain all information

required to identify, communicate with, and calculate damages for, the Class Members."  *Id.* at 62–63; *see also* Filing No. 100 at 34 ("Plaintiffs can easily list who Defendants gave credits to and for how much by querying Defendants' databases.").

Finally, Plaintiffs contend that the "remediation plan" purportedly implemented by Defendants is, in fact, "nonexistent." (Filing No. 100 at 34–35.) While

> there **was** a . . . proposed refund plan that Defendants developed internally to address some of the unlawful fees collected in relation to the "missing invoices" at issue in this lawsuit[,] . . . the States **rejected** Defendants' proposal to implement "Phase 2" **more than fourteen (14) months ago** because it sought to use taxpayer funds to issue refunds to those harmed by Defendants' wrongful actions.

*Id.* at 35 (emphases in original).  In short, Plaintiffs maintain that despite Defendants' contention, they "have not implemented a refund program to address the 'missing invoices' and unlawful fees at issue in this litigation." *Id.* at 36.  To Plaintiffs, "Defendants cannot be trusted to administer any refund plan now after they have been sued" when they have "provided Class Members with literally false information, concealed their wrongful conduct for years, and still deny liability." *Id.* at 37.

With these multi-class arguments now summarized, the Court will move on to class-particular contentions.

### 1.    **Damages Class**

Plaintiffs propose that the Court certify a "Damages Class" that includes "[a]ll individuals and entities who paid administrative fees, violation fees, collections fees, and/or penalties arising from use of the Riverlink Connect Tolling System using Unregistered Video Accounts." (Filing No. 79 at 32.) Plaintiffs maintain that certification is appropriate because "Defendants used tolling software parameters and deceptive form letters to [convince Damages] Class Members to pay unlawful fees while misrepresenting to those [Damages] Class Members that the fees were owed under Indiana law." *Id.* at 8. Defendants, however, contend that, "[a]s an initial matter, the Court

should not certify Plaintiffs' Damages Class because Plaintiffs cannot maintain a cognizable claim for relief for an alleged breach of the Business Rules entered into between the States and Defendants." (Filing No. 93 at 44.)[11]  Even so, Defendants continue, certification should be denied because "(1) Plaintiffs' Damages Class includes many members who did not suffer any injury; and (2) individual questions will predominate over any common issue of fact or law." *Id.* So subdivided, the Court will address these two contentions in turn.

  a.  **<u>Injury</u>**

  Defendants argue that certification is precluded because "Seventh Circuit precedent prohibits certification where . . . the class would contain many members who suffered no injury caused by the defendant," and "Plaintiffs' Damages Class unquestionably includes hundreds of thousands (if not millions) of individuals who have suffered no injury." *Id.* at 45 (citing *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514–15 (7th Cir. 2006)). "Tellingly," Defendants maintain, "Plaintiffs do not even attempt to explain how they were possibly injured by the alleged use of an incorrect due date on their toll notices." *Id.* In fact, Defendants purport that "Plaintiffs' proposed class is rife with drivers who received notice that they incurred a toll and paid it the next day (or anytime between days 1–30); for those members, there is no conceivable injury under any legal theory." *Id.* In sum, the Court should not certify a class "that consists of many members who suffered no injury."  *Id.* at 45–46 (citing *McFields v. Dart*, 982 F.3d 511, 517 (7th Cir. 2020)).

  In addition to their broad argument outlined above, Plaintiffs reply that Damages Class members "were each harmed by Defendants' failure to comply with the Business Rules' requirements, which govern Defendants' operations." (Filing No. 100 at 11.) In fact, since Defendants do not "follow the Business Rules in their dealings with Class Members[,] . . .

---

[11] The Court reserves determining this issue at the class certification stage as it resolves this Motion on other grounds.

Defendants' fees are unlawful," creating a *prima facie* case in tort and equity." *Id.* at 11–12. In short, "[e]ach Damages Class Member paid Defendants a fee they did not owe at Defendants' insistence and threat of additional penalties." *Id.* at 12 (footnote omitted). And while Defendants "confuse contract and tort law[,] . . . the TS Agreement provides third-party beneficiary rights" (giving the Damages Class a contractual right), and in any event, the Damages Class "seeks [tort] damages – Class Members' money back, statutory damages, and all other available remedies." *Id.* at 12–13. While Defendants contend that the Damages Class is overinclusive by including individuals who timely paid their tolls, "[a]ll Damages Class Members suffered injuries by paying Defendants improper fees" since "Riverlink customers who pay within thirty (30) days of the 'Invoice Date' are not assessed fees." *Id.* at 14. In sum, "Defendants owed each Class Member a duty under Indiana law. Defendants breached their duty to all Class Members in the same fashion using the same system parameters. Defendants' actions caused each Class Member to confer a benefit to Defendants and suffer the same type of harm." *Id.*

The Court agrees with Plaintiffs: because only those individuals who *paid* fees and/or penalties—in addition to their tolls—are contemplated as Class Members in the Damages Class (*see* Filing No. 79 at 32), this class, broadly speaking, does not "include[ ] hundreds of thousands (if not millions) of individuals who have suffered no injury." (Filing No. 93 at 45.) In other words, arguing widespread lack-of-injury, Defendants seemingly misapprehend the structure of the Damages Class by concluding that it would include those who timely paid their tolls, which, of course, excused them from any fee/penalty payments. The Damages Class, however, includes only those who *actually paid* these fees/penalties. *Cf. McFields*, 982 F.3d at 514, 517 (holding overinclusive a putative class—consisting of detainees who submitted health request forms "complaining of dental pain [but who] did not receive a face-to-face assessment"—because it could

include, for example, (1) a detainee "treated by a world-class dentist" without a face-to-face assessment and (2) "a perfectly healthy detainee falsely indicat[ing] extreme pain"). But, as describe in the following section, the Damages Class suffers from separate concerns regarding inclusivity of membership.

### b. <u>Predominance of individual issues</u>

Defendants also argue—presumably under Rule 23(b)(3)—that the questions deriving from the "legal theory" underlying the Damages Class "can only be answered through individualized assessments of the facts of each class member's claim." (Filing No. 93 at 46 (citation omitted).) First, "[d]etermining whether each class member has been damaged requires an individualized assessment to answer (at least) each of the following questions:" (1) "Whether each class member actually paid any fees assessed to them under the RiverLink system"; (2) "When each class member actually paid any fees assessed to them under the RiverLink system"; (3) "Whether each class member relied on the toll notice form's reference to the invoice due date in making payment." *Id.* at 47. Too many disparities exist among proposed Damages Class members, Defendants insist, when that class "includes motorists who (i) paid their tolls within 30 days of the invoice, (ii) did not pay within this time period but were excused by a grace period, (iii) paid so late that no reduction in time could be relevant, and (iv) never paid." *Id.* at 48. On top of this, other proposed Damages Class members "would have paid based on receipt of an invoice generally, and not relied at all on the invoice due date in making their decision to pay the invoice." *Id.*

Defendants maintain that "Plaintiffs have failed to demonstrate that any individual putative class member's ability to recover can be addressed through anything other than thousands of mini-trials." *Id.* (citation omitted). This conclusion is buttressed, Defendants argue, by "the Magistrate Judge's Report recommending the dismissal of Barker's complaint," since that recommendation

recognized "that an individualized inquiry is necessary to determine whether each class member has actually incurred damages cognizable under Indiana law." *Id.* at 49. Finally, because Defendants "willingly provide refunds where users ask for one[,] . . . [i]ndividualized assessments of other class members who may have similarly sought and obtained refunds, waivers, or credits, is necessary to resolve this case." *Id.* at 50 (citation omitted).

Defendants also contend that the fraud-based claims, in particular, require individualized scrutiny to "prove that [proposed Damages Class members] relied on a purported misrepresentation by Defendants." (Filing No. 93 at 50.) In fact, Plaintiffs have provided no evidence that they "were even aware of the date by which their toll fees were due, that they . . . relied in any way on the invoice due date on the toll notices, or that this date was material to them." *Id.* at 50–51. Moreover, because determining the materiality of misrepresentations "is often conducted on a case-by-case basis," the Court should not certify this Damages Class when "Plaintiffs have offered no evidence that the alleged misrepresentations were material." *Id.* at 51.

Finally, Defendants argue that Plaintiffs' equitable claims require individualized analysis: "It cannot be determined on a class basis whether a benefit (or money) was unjustly conferred on Gila (or any other defendant) by any class member." *Id.* In fact, "mini-trials" will be required to "prove (1) which putative class members saw the due date, (2) which putative class members actually paid the invoice; and (3) whether it caused him or her any injury. Obviously, someone who did not confer any benefit on a defendant cannot prevail on an unjust enrichment claim." *Id.* at 52 (citations omitted).  Defendants note that a recent U.S. Supreme Court case held that "'[o]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court.'" (Filing No. 172-1 at 3 (quoting *TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2205 (2021) (emphasis in original)).) To Defendants, this

supports their argument that, "even accepting Plaintiffs' interpretation of the Business Rules, such a bare procedural violation does not suffice to support standing absent evidence that Plaintiffs themselves and the absent class members suffered a concrete and particularized harm." *Id.* at 2.

In tandem with their comprehensive argument already summarized, Plaintiffs reply that attacks on the Damages Class are misplaced when this class applies only "to those UVA Customers who paid fees, not to those who were only assessed fees." (Filing No. 100 at 8 (emphasis removed).) Moreover, Defendants "incorrectly conclude that the Damages Classes include UVA Customers who 'paid their tolls within 30 days of the invoice' and were never charged fees." *Id.* Replying to Defendants' contention regarding recently-resolved *Ramirez*, Plaintiffs argue that some class members in that case did not suffer harm when no third parties received the inaccurate credit reports at issue in the case and "no evidence indicated class members opened or relied on" any mis-formatted or misleading mailings (Filing No. 175-1 at 1–2 (citing 141 S.Ct. at 2210, 2213–14)). Here, however, "each Class Member suffered a concrete injury" when "Defendants' toll notices contained literally-false information, demanded payment, and were received and relied on by Class Members as evidenced by their payment." *Id.* at 2.

The Court must agree with Defendants on this front. True, it is clear that "each class member actually paid any fees assessed to them under the RiverLink system": the Damages Class is constrained, as discussed above, to those who actually paid fees/penalties, not those who were merely assessed them or who paid only tolls (*see* Filing No. 79 at 32 (defining Damages Class as "[a]ll individuals and entities who *paid* administrative *fees*, violation *fees*, collections *fees*, and/or *penalties* arising from use of the Riverlink Connect Tolling System using Unregistered Video Accounts.") (emphases added)). But the Court finds that it matters, crucially, "[w]hen each class member actually paid any fees assessed to them under the RiverLink system."

Under Plaintiffs' theory of the case, "each 1st Toll Notice [must] include a 'Due Date' of thirty-five (35) days after the date on which the notice is generated." (*See* <u>Filing No. 100 at 11</u>.) Under this theory, then, no injury could befall individuals who paid their first fee or penalty thirty-five days *after* notice generation.  In other words, Plaintiffs do not seem to contend that Defendants cannot assess at least initial fees and/or penalties thirty-five days following the generation of a notice, so how could individuals paying their first fees and/or penalties after that window suffer injury? And as this case involves escalating fees and penalties cascading from the first "due date," this Damages Class, as structured, is overly inclusive and too broad to be limited to only those who suffered harm. How are the parties and the Court to, on a class-wide basis, discern who was actually harmed without minutiae overrunning the case? *Cf. Ramirez*, 141 S. Ct. at 2214 ("No concrete harm, no standing. The 1,853 class members whose credit reports were provided to third-party businesses suffered a concrete harm and thus have standing as to the reasonable-procedures claim. The 6,332 class members whose credit reports were not provided to third-party businesses did not suffer a concrete harm and thus do not have standing as to the reasonable-procedures claim."). This cannot be simply determined by asking whether a fee was paid. Because "the question whether damages are owed for many, if not most, of the proposed class members can be resolved only after a highly individualized inquiry," *Riffey v. Rauner*, 910 F.3d 314, 319 (7th Cir. 2018) (quotation omitted), "a class action is [not] superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Moreover, this concern "suggests not only that individual questions predominate at this stage of the litigation, but also that it would be difficult to manage the litigation as a class." *Riffey*, 910 F.3d at 319 (quotation omitted), 318 ("The decision whether to certify a class is one that depends on a careful assessment of the facts, of potential differences among class members, of

management challenges, and of the overall importance of the common issues of law or fact to the ultimate outcome.").  Finally, this concern implicates Rule 23's ascertainability requirement that "class definitions generally need to identify a particular group, harmed during a particular time frame, in a particular location, in a particular way." *See Mullins*, 795 F.3d at 660. For the reasons discussed above, the Court will **deny** Plaintiffs' request to certify its proposed Damages Class.

### 2. Damages Subclass

Plaintiffs also request that the Court certify a "Damages Subclass" consisting of "[a]ll individuals and entities who paid administrative fees, violation fees, collections fees, and/or penalties for failure to timely pay a Toll Notice that was never printed and mailed by Defendant." (Filing No. 79 at 32.) Certification is warranted, Plaintiffs contend, when "Defendants used form letters to convince all [Damages] Subclass Members to pay fee and penalties for failing to pay toll notices that Defendants never mailed to them." *Id.* at 8. Defendants respond that the Damages Subclass cannot meet the demands of either Rule 23(a) or Rule 23(b) (Filing No. 93 at 52). As above, the court will tackle these contentions separately.

### a. Rule 23(a)(3) (typicality), 23(a)(4) (adequacy)

Defendants maintain that the Damages Subclass fails on "Rule 23(a)'s typicality and adequacy requirement[s]" because Plaintiffs do no "possess the same interest and suffer the same injury as the putative class members." (Filing No. 93 at 53.) In fact, "Plaintiffs face defenses peculiar to them that render them unable to serve as class representatives." *Id.* For her part, Barker "no longer maintains a redressable claim against Defendants" since "she has not suffered any injury caused by Defendants" when "[a]ny allegedly improper charge to Barker was refunded or credited to her well before this lawsuit was filed." *Id.* As for Outzen, "Defendants have fully refunded to [her] all fees that she disputes in this litigation." *Id.* at 54. And "Ardaiolo does not allege that he failed to receive any notice from Defendants"; instead, because "his claims solely challenge

Defendants' compliance with the Business Rules," Ardaiolo "is not even a member of Plaintiffs' Damages Subclass." *Id.* (citations omitted). Moreover, these Plaintiffs are "inadequate" as representatives for the Damages Subclass because "they seek a remedy that other members of the class have already received, and that is available to all members of the putative class through Defendants' and the States' remediation." *Id.* (citation omitted). Efforts have been undertaken, Defendants note, to identify "customers potentially affected through processing errors," and these strategies "will target customers actually affected." *Id.* at 54–55.

Plaintiffs, besides their argument summed up above, reply that since Barker and Outzen, like all Damages Subclass members, "paid fees without being mailed a proper Toll Notice," they "meet Rule 23(a)(3)'s typicality requirement." (Filing No. 100 at 15.)  And while a plaintiff may be found inadequate if "(1) the defendant refunded most purchasers' money before litigation during a widely publicized recall; (2) the plaintiff's only relief was a refund; and (3) those not refunded were unidentifiable and were not members of the putative class," here, "(1) Defendants have no refund program and actively conceal their conduct; (2) Plaintiffs seek damages in excess of a refund; and (3) All Class Members are identifiable and suffered harm." *Id.* at 15–16 (citing *In re Aqua Dots Products Liability Litigation*, 654 F.3d 748, 751–52 (7th Cir. 2011)).

Even though Defendants contend that affirmative defenses specific to Barker and Outzen "defeat" typicality and adequacy, this should only occur when "defenses are arguable, unique, and likely to usurp [the plaintiff's] time and energy to the detriment of the class." *Id.* at 16 (citation omitted). Here, "Barker has not used [an] account [she created to challenge her bills], would not have agreed to it if she knew Defendants were attempting to settle her claims, and still has not received a refund of money". *Id.* at 16. Additionally, Defendants "tried to force settlement of [Outzen's] claims by mailing her a $5.00 check," but she has "rejected the offer and never cashed

the check." *Id.* at 17. While Defendants' arguments go toward mootness (in that Barker and Outzen have no possible additional relief available), these Plaintiffs "request statutory remedies in excess of their fees," and "Defendants cannot moot [ ] Barker's and [ ] Outzen's claims against their will." *Id.* (citation omitted). "If anything," Plaintiffs conclude, "Defendants' moot-attempts create a class-wide issue." *Id.* at 18.

On these points, the Court agrees with Plaintiffs. At the outset, Defendants undisputedly cannot moot claims by offering unaccepted refunds/credits to parties. *See Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 165 (2016) ("[A]n unaccepted settlement offer or offer of judgment does not moot a plaintiff's case.").[12] Additionally, Plaintiffs have demonstrated that alternative remediation efforts outside this litigation are far from established: The States have already firmly rejected a proposal from Defendants to this end, and Defendants have not provided any additional evidence that a widescale refund program has been approved, let alone successfully launched and executed. *Cf. In re Aqua Dots*, 654 F.3d at 751 ("[T]he recall was widely publicized. Why bear these costs a second time? The Consumer Products Safety Commission has not expressed dissatisfaction with the recall campaign or its results, and the record does not contain any evidence of injury to children after the recall was announced. Spin Master believes that most of the 400,000 kits not returned in the recall were used before the recall began and that few, if any, defective kits remain in consumers' hands.").

Barker and Outzen meet the typicality and adequacy requirements as contemplated by Rule 23(a). Regarding typicality, these plaintiffs, like all putative Damages Subclass members, did not receive first toll notices, and individualized defenses and claims would not commandeer their ability to represent other class members when Barker and Outzen have expressly rejected

---

[12] Barker clearly did not intend to accept the funds as a settlement despite receiving them in her later-created RiverLink account (*see* Filing No. 100-1 at 2).

Defendants' extrajudicial offers of recompense. If anything, Barker and Outzen represent the Damages Subclass even better in this sense, as Defendants maintain that they will freely offer refunds to those seeking them, just as they did with these plaintiffs.

As for adequacy, this component "is composed of two parts: the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest of the class members." *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993) (quotation omitted). Here, both considerations are met when Plaintiffs' counsel has established their commitment and ability to handle this case and Barker and Outzen have shown that they are also dedicated to protecting the different, separate, and distinct interests of the class members. *See Rand v. Monsanto Co.*, 926 F.2d 596, 599 (7th Cir. 1991) ("[T]he named plaintiff must have some commitment to the case, so that the 'representative' in a class action is not a fictive concept.") (emphasis removed), *overruled on other grounds by Chapman v. First Index, Inc.*, 796 F.3d 783 (7th Cir. 2015). In short, these plaintiffs are "part of the class and possess the same interest and suffer the same injury as the class members," and the Court is "satisfied that [they] will keep the interests of the entire class at the forefront." *Conrad v. Boiron, Inc.*, 869 F.3d 536, 539 (7th Cir. 2017) (quotations omitted).

> **b.**    **Rule 23(b)(3)**

Defendants argue that "individualized questions of fact predominate over any common questions." (Filing No. 93 at 55.) Defendants contend, "the proposed Damages Subclass as defined includes individuals who may not have paid any fees and may not have paid any late fees or other fees for violations," as well as individuals "who had funds reimbursed, credited, or waived." *Id.* To this point, a factfinder would be required to individually "determine (a) whether each putative class member was in fact sent a prior notice, and if not, (b) the circumstances of any late fee payment (if made at all), and (c) whether the individual has already had those charges reimbursed,

waived, or credited." *Id.* And while some records do "suggest" that certain notices were not sent, "some individuals who Defendants could not confirm had been sent such a notice actually made timely payments, suggesting that they were notified, and clearly showing that they were not injured." *Id.* at 55–56.

So, instead of representing a conclusive fact that notice was not given to certain individuals, these records may merely signify "an internal record-keeping anomaly". *Id.* at 56. And not only would there need to be an "individualized inquiry to determine who in fact did not receive a notice," but because "the first phase of the remediation has already taken place," individualized inquiry would be required to determine who has already received any renumeration from Defendants. *Id.* Relatedly, "[v]oluntary" and continued efforts at remediation on the part of Defendants is a "superior means of resolving the issues in this litigation," which relies on "unwieldy and unmanageable" classes. *Id.* at 57 (citations omitted).

Plaintiffs (again, along with their all-encompassing contentions) argue that despite Defendants now reversing on their position that they "did not mail invoices to an identifiable group of hundreds of thousands of individuals before fining them," this position contradicts prior "testimony under oath." (Filing No. 100 at 38.) And, in any event, this about-face has no bearing on the case when any individual making a timely payment "was not charged fees, and would not be a member of any of the Proposed Classes." *Id.* at 39.

The Court determines that this is where the argument for certification of the putative Damages Subclass, as was the case with the Damages Class, falls apart: How can the Court determine who was injured by lack of a 1st Toll Notice without individualized questions overtaking the litigation? As above, lack of receipt of a 1st Toll Notice does not necessarily automatically equate to injury when some, for example, paid outside of the pertinent windows and

others paid their tolls despite never purportedly receiving a toll notice. As noted by Defendants, "the circumstances of any late fee payment," on an individual level, will dominate the Court's attention if the Damages Subclass were certified because identifying properly situated members would be "a complex, highly individualized task, and cannot be reduced to the application of a set of simple, objective criteria." *See Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 496 (7th Cir. 2012) (putative class was too broad for certification to be appropriate when some potential class members were unidentified and identifying those potential class members was "a complex, highly individualized task, and cannot be reduced to the application of a set of simple, objective criteria."); *see also Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006) (affirming denial of certification, noting that "millions" of people were improperly included in the proposed class). Moreover, this class too is plagued by Rule 23's ascertainability requirement "that classes be defined clearly and based on objective criteria. *See Mullins*, 795 F.3d at 659.

Because individualized concerns predominate, the Court **denies** Plaintiffs' request to certify the Damages Subclass as well.

### 3.   Issue Class

Finally, Plaintiffs ask the Court to certify an "Issue Class"

> As to all individuals and entities who are assessed administrative fees, violation fees, collections fees, and/or penalties arising from their use of the Riverlink Connect Tolling System using Unregistered Video Accounts, whether Defendants may lawfully assess administrative fees, violation fees, collections fees, and/or penalties against UVA Customers when Defendants (1) set the 1st Toll Notice due date for less than thirty-five (35) days after the date of the notice's generation; and/or (2) failed to mail the requisite prior notice to the UVA Customer as described in the Business Rules.

(Filing No. 79 at 32.)   Plaintiffs contend that the Court should certify this class because "Defendants used tolling software parameters and form letters to charge [Issue] Class Members

fees and penalties without first providing [Issue] Class Members proper notice and time to pay their toll notices." *Id.* at 8.

But Defendants maintain that Plaintiffs, in addition to failing to even argue "how certification of the Issue Class meets Rule 23's standards," have not carried their burden for certifying the Issue Class for "additional reasons." (Filing No. 93 at 58–59.) First, the "Issue Class faces the same deficiencies described above" since it "effectively combines Plaintiffs' Damages Class and Damages Subclass." *Id.* at 59. Specifically, this class, like the others, "includes many members who were not injured, and the named Plaintiffs are neither adequate class representatives nor advance claims that are typical of the class members." *Id.* Second, the Issue Class is not "administratively workable" because Plaintiffs have not explained "how the Court could try" its claims. *Id.* (citing *Lopez v. Sears, Roebuck & Co.*, No. 11-cv-0728-BBC, 2012 WL 13042619, at *4 (W.D. Wis. Oct. 11, 2012) (observing that it is a plaintiff's responsibility to explain how a case would proceed efficiently if issue class was certified)). Again, resolution of claims in this class "will require thousands of mini-trials," and "any award of damages would still need to be addressed on an individualized, case-by-case, claim-by-claim basis." *Id.*

Plaintiffs, alongside their earlier argument, reply that this class is designed to "absolve" customers of outstanding, yet unlawfully assessed, fees (Filing No. 100 at 7). Since "[t]he Court will likely need to decide this issue during litigation because it is important to the Damages Class," Plaintiffs continue, it "makes sense for this Court to certify the Issue Class." *Id.* at 39. In other words, "[c]ertifying Plaintiffs' Issue Class allows the Court to settle a major issue in this case in one fell swoop. It avoids the risk of divergent judgments because the issue is decided for all Class Members in one proceeding, and the issue materially advances this litigation." *Id.* at 40 (citing *Jacks v. DirectSat USA, LLC*, No. 10-CV-1707, 2015 WL 1087897, at *7 (N.D. Ill. Mar. 10,

2015)). Plaintiffs conclude that "the Issue Class is likely an issue of law that can be decided without a jury, so deciding it is unlikely to require a trial at all," further supporting certification. *Id.*

The Court can reject this certification request in short order: this putative class is even broader than the others denied above because it pulls in all individuals and entities ever "assessed"—not just those who paid—fees and/or penalties from use of RiverLink. If the other proposed classes were overly broad, the Court need not explicate at length as to why this class falters on the same premise. Moreover, with no Damages Class certified, the Court will not "likely need to decide this issue during litigation." (*See* Filing No. 100 at 39.) For these reasons, the Court **denies** certification of the Issue Class.

## IV.    CONCLUSION

For the reasons described above, the Court **DENIES** Plaintiffs' Amended Motion for Class Certification (Filing No. 77) and **GRANTS** Defendants' Motion for Leave to File Notice of Supplemental Authority (Filing No. 172).

**SO ORDERED.**

Date: 9/29/2021

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Jacob R. Cox
COX LAW OFFICE
jcox@coxlaw.com

Jonathon Noyes
WILSON KEHOE & WININGHAM
JNoyes@wkw.com

William E. Winingham
WILSON KEHOE & WININGHAM
winingham@wkw.com

James R. A. Dawson
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
jdawson@taftlaw.com

Manuel Herceg
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
mherceg@taftlaw.com

Steven T. Henke
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
shenke@taftlaw.com

Tracy Nicole Betz
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
tbetz@taftlaw.com

Vivek Randle Hadley
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
vhadley@taftlaw.com

Jonathan W. Garlough
FOLEY & LARDNER LLP
jgarlough@foley.com

Robert H. Griffith
FOLEY & LARDNER LLP
rgriffith@foley.com

Irina Kashcheyeva
FOLEY & LARDNER LLP
ikashcheyeva@foley.com

Michael D. Leffel
FOLEY & LARDNER LLP
mleffel@foley.com